**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| AMRIT KUMAR and TONY TEP, Individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>SAEXPLORATION HOLDINGS, INC., JEFF HASTINGS, BRIAN BEATTY, BRENT WHITELEY, L. MELVIN COOPER, GARY DALTON, DAVID D. SGRO, GREGORY R. MONAHAN, AND MICHAEL FAUST,<br><br>    Defendants. | Case No: 4:19-cv-03089<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Co-Lead Plaintiffs Amrit Kumar ("Kumar") and Tony Tep ("Tep") (together, "Plaintiffs"), by Plaintiffs' undersigned attorneys, individually and on behalf of all other persons similarly situated, allege the following based upon their personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding SAExploration Holdings, Inc. ("SAExploration" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded SAExploration securities from March 15, 2016 through February 7,

2020, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      SAExploration is a publicly traded company which provides geophysical and seismic services, principally for the oil & gas industries, all over the world, with significant operations in the North Slope area of Alaska.

3.      This case arises out of a fraudulent scheme that was planned and carried out at the very highest levels of the Company.   Defendants Jeffrey Hastings, then the Company's Chairman and Chief Executive Officer, and Brent Whiteley, its Chief Financial Officer and General Counsel, and with the knowledge or reckless disregard of the Company's Board of Directors—including Defendants Brian Beatty (also then the Company's Chief Operating Officer and former Chief Executive officer), David D. Sgro, Gregory R. Monahan, L. Melvin Cooper, Gary Dalton, and Michael Faust—diverted corporate funds and generated fictitious revenue and earnings for the Company through a series of disguised transactions with a putative "customer" that was, in actuality, owned and controlled by SAExploration, Hastings, and Whiteley.

4.      In addition, between 2011 and 2019, Hastings and Whiteley formed or acquired controlling interests in shell companies to embezzle funds from SAExploration. These transactions were disguised as payments for rental, consulting, and tax expenses in SAE's contemporaneous SEC filings.

5.      Through this scheme, SAExploration overstated its revenue by as much as 33% in its Fiscal Years ("FY") 2015 and 2016—hiding what were in fact huge and mounting operating losses from investors and the market. Defendants Hastings and Whiteley, with the knowledge and even active participation of other key players at the Company—including its former CEO

and then COO, Defendant Beatty, along with its Vice President of Finance, Ryan Abney—perpetuated this fraud upon the public in order to maintain SAExploration as their personal piggy-bank, repeatedly and flagrantly embezzling funds from the Company for their personal enjoyment.

6.    When the oil industry (and with it, SAExploration) hit a rough patch with the collapse of oil prices in mid- to late-2014, Defendants needed a way to keep the Company afloat. Hastings, a veteran of the Alaska petroleum industry, was familiar with a curious stimulus program that the state of Alaska was then pursuing to incentivize exploration of oil & natural gas on its inhospitable North Slope area—a form of refundable and transferrable tax credit (the "Exploration Credits"). These credits were by their terms only available to small operations—smaller than SAExploration—but if they could tap in, they knew the tax credits could be monetized to help keep SAExploration in the black (or, if not in the black, at least a little less in the red).

7.    Whiteley then formed a series of companies through which they transferred roughly $12 million from SAExploration. After skimming a little over $6 million for their own personal use, Whitely and Hastings, with the help of the Company's VP of Finance Ryan Abney, diverted the rest to create a puppet company—Alaska Seismic Ventures, LLC ("ASV")—ultimately owned and controlled by Whiteley and Hastings—to collect seismic data "on spec," or on speculation (without a client paying the tab up front, but with the intention of auctioning the data to the highest bidder somewhere down the line). With a relatively small capital outlay of a few million dollars, Whiteley and Hastings would take advantage of Exploration Credits, which they could then use to help finance their collection of seismic data—for which SAExploration was their sole provider.

8.     Whiteley and Hastings used ASV to purchase services from SAExploration, generating fake business that artificially boosted SAExploration's earnings for 2015 and 2016, inflating the Company's reported revenue for those periods by as much as 33%, and transforming large operating losses into small operating profits.

9.     The house of cards began to collapse in late 2016. As a precipitous decline in the price of oil led to reduced tax revenues from oil extraction, the state of Alaska began appropriating less and less to fund monetization of the Exploration Credits it had issued, and credits with face values in the hundreds of millions of dollars piled up with no ready source of payment.

10.     As ASV's sole source of funds to pay for seismic data collection dried up, so too did the amount of work (and revenue) it offered SAExploration. In its 10-Q filed on November 4, 2016, SAExploration shocked the market by reporting a massive drop in revenue and earnings for the North American market. The Company attributed this precipitous decline to turmoil in the international petroleum markets—but in reality, the decline was a direct result of the evaporation of bogus revenues from SAExploration's self-dealing transactions with ASV. As the fake business evaporated, the Company's reported that results declined from modest operating profits to huge operating losses overnight, and the artificial inflation in the price of SAExploration's stock began to collapse, injuring investors.

11.     The Company suffered another significant loss in revenue and reported income as reflected in its 10-Q filed on August 21, 2017, losing over $17 million, attributed in part to a heavy drop in revenue from in Alaska compared to the same period in the prior year. On this news, the Company's stock price declined by approximately 15.1%, or $6.17 per share (split-adjusted), further damaging investors.

12.     Further, due in large part to SAExploration's continued difficulty monetizing the Alaska tax credits, SAExploration's 10-K for FY 2018 revealed a massive net loss of $82.7 million on March 25, 2019. This news was followed by SAExploration's share price plummeting further by approximately 8.96% and 9.29% on March 26 and 27, 2019, respectively.

13.     As ASV slid further and further behind on its tens of millions of dollars in receivables owed to SAExploration, the Company was forced to begin reporting a modest allowance for bad debts, and later to explain how one of its top 3 customers for FY 2015 and 2016 was unable to pay its tab, describing arcane issues involving monetization of Alaska oil & gas tax credits. Eventually, Hastings and Whiteley had ASV assign its interests in these credits to SAExploration as collateral, leading to another round of circuitous disclosures in which SAExploration continued to take pains to conceal the true nature of these transactions.

14.     Needless to say, the corpse of ASV was beginning to stink, and regulators took notice. On August 15, 2019, the Company was forced to reveal that it was under investigation by the SEC, had identified material weaknesses in its financial controls, that its historical financial statements should not be relied upon and would need to be restated, and that its CEO Hastings and CFO and General Counsel Whiteley were stepping down, with Hastings being placed on administrative leave and Whiteley being immediately terminated. In the same press release, SAE also revealed that it was in discussions with certain holders of its outstanding debt as to whether the Company was in default of its obligations under its debt agreements. The market reacted immediately and decisively to these revelations, with the price of SAE's stock dropping by more than 31% on extraordinarily heavy volume, damaging investors.

15.     On September 23, 2019, the Company filed with the SEC a Form 8-K announcing its entry into Material Definitive Agreements with its various lenders. SAExploration revealed

5

that it was in default under the terms of its credit facility agreement and other debt instruments as a direct result of the forthcoming restatements, and had reached temporary forbearance agreements with certain of its creditors to avoid acceleration of its repayment obligations. On this news, the price of SAExploration's securities took another hit, falling by 5.79%.

16. On December 13, 2019, SAExploration entered into an Asset Purchase Agreement to sell off ASV's library of seismic data for a price deeply discounted from the book value at which the Company was carrying the associated receivables. Over the course of the next day, the price of SAExploration's shares dropped again, for a further loss to investors of approximately 7.58%.

17. On January 27, 2020, SAExploration filed another Form 8-K attaching amendments to its forbearance agreements with its vendors, which revealed additional facts about the events of default related to its forthcoming restatements. The market swiftly reacted to this new information, and Company's stock price tumbled again, sinking 13.91% from the previous day's close.

18. On February 7, 2020, after close of business, SAE filed amendments to its FY 2018 Form 10-K (the "10K/A") and its Form 10-Q for the first quarter of 2019 (the "10Q/A"), together with 10-Qs for the second and third quarters of 2019. The amended filings included restatements of its financial reports for FY 2018 and 2017, as well as restatements of audited consolidated financials for FY 2017 and FY 2018, as well as unaudited interim financial statements between March 31, 2017 and December 31, 2018, and amended its quarterly filing for the period ended March 31, 2019, and filed delayed quarterly reports for the periods ended June 30, 2019 and September 30, 2019. SAExploration revealed to the market the results of its correcting its accounting for ASV as a variable-interest entity, which eliminated over $100

million in illusory revenue from its books in FY 2015 and FY 2016 alone. These filings also revealed for the first time the nature and extent of fraud and embezzlement carried out by Defendants, identifying a number of fraudulent transactions through which more than $10 million had been embezzled by Hastings and Whiteley, how those funds were misclassified and misreported in SAE's previous annual and quarterly reports as, *inter alia,* rental fees and consulting expenses, and that those amounts were being reclassified as "loss from the misappropriation of funds." In response to these revelations, the price of SAE's stock sank yet again, dropping approximately 4.84%, and further damaging investors.

19.     SAExploration and certain of the Individual Defendants are currently under investigation by the SEC, the U.S. Department of Justice, and the Alaska Department of Revenue in connection with the above conduct.

20.     Hastings and Whiteley had ample motive to commit securities fraud. There were, of course, their jobs and compensation packages, tied as they were to the continued operation of the Company, and each of them owned a significant number of SAExploration's common shares, as well as participation in SAExploration's credit facility and debt securities. But more importantly, the longer they could keep SAExploration afloat, the longer they could continue their established habits of embezzling corporate funds for their own enjoyment. And embezzle they did—between them, Hastings and Whiteley misappropriated millions over the course of their tenure with SAExploration.

21.     Hastings, Whiteley, and their accomplices within SAExploration orchestrated this brazen fraud upon investors and the market so they could continue to use SAExploration as their own personal piggy bank.

22.     Throughout the Class Period SAExploration, through Hastings and Whiteley,

repeatedly and falsely certified that its annual and quarterly financial statements were prepared in accordance with U.S. Generally Accepted Accounting Principles ("U.S. GAAP"). In truth, U.S. GAAP required SAExploration to report ASV—which was created and operated for SAExploration's benefit and lacked the means to operate independently of the Company—as a variable-interest entity ("VIE"), and to disclose the relationship and consolidate its results of operations with SAExploration's financial reports. U.S. GAAP prohibits recognition of revenue or loss from transactions with a VIE. Had SAExploration recognized ASV as a VIE, it would never have reported these sham revenues and receivables. Additionally, SAExploration throughout the class period repeatedly violated U.S. GAAP by mischaracterizing as legitimate costs and expenses amounts that were, in fact, embezzled by Hastings, Whiteley, and their accomplices for their own personal use, and therefore should have been recorded as losses from misappropriation of funds.

23.     Throughout the Class Period, SAExploration, through Hastings and Whiteley, repeatedly and falsely certified the accuracy of the Company's financial statements and the adequacy of the Company's internal controls. These certifications were knowingly and intentionally false and misleading when made.

24.     In truth, SAE's internal control procedures—if they existed at all—were so comically ineffective as to be functionally illusory. Whiteley and Hastings did little to cover their tracks. Even a cursory investigation of these entities would have aroused immediate suspicion and led any competent internal or external auditor to question their legitimacy. Information from public records would have immediately disclosed that SAE was paying millions to entities that were owned and controlled by its sitting CEO, and/or incorporated by Whiteley and ostensibly headquartered in his *literal* backyard.

25.     That Hastings and Whiteley were able to override or contravene SAE's internal controls to execute such a brazen scheme over the course of nearly a decade illustrates the manifest failure and inadequacy of SAE's internal controls during the Class Period.

26.     Defendant Beatty, the founder of the Company and former CEO, sat on the Board of Directors and acted as SAExploration's Chief Operating Officer throughout the Class Period, until late December of 2020. Defendants Sgro, Monahan, Cooper, Dalton, and Faust were directors on SAExploration's Board, and members of the Board's Audit Committee during the Class Period, of which Defendant Faust was the lead member throughout 2017 and 2018.  All were duty-bound to conduct oversight of SAExploration's financial reporting and internal controls. Defendants acted knowingly or recklessly in failing to conduct adequate oversight of SAExploration's operations and financial reporting, and in consenting to and/or issuing the false and misleading financial statements in SAExploration's annual and quarterly SEC filings throughout the class period.

27.     By restating its previously-issued annual and quarterly financial statements for FY 2014, 2015, 2016, and 2017, SAExploration and its sitting Board of Directors, including Defendants Sgro, Monahan, Cooper, Dalton, Menkes, Mercer, and Faust—have acknowledged that the above-referenced misstatements were materially false and misleading. The facts alleged herein, if revealed, would have been deemed material to the mind of a reasonable investor.

28.     As a direct result of the material misstatements and omissions in SAExploration's periodic SEC filings, the price of SAExploration's securities was and remained artificially inflated throughout the Class Period. When the details of SAExploration's misstatements and omissions were revealed through a serious of partial corrective disclosures, as detailed herein, the price of SAExploration's securities precipitously declined, causing significant damage to

investors.

## JURISDICTION AND VENUE

29.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

30.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

31.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the Company's principal executive offices are located in this judicial district and alleged the misstatements and the subsequent damages took place in this judicial district.

32.     In connection with the acts, conduct and other wrongs alleged in this amended complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

33.     Co-Lead Plaintiff Amrit Kumar ("Kumar") is a resident of Milpitas, California, and as set forth in the accompanying certification incorporated by reference herein, purchased SAExploration securities during the Class Period and was economically damaged thereby.

34.     Co-Lead Plaintiff Tony Tep ("Tep") is a resident of Fairfax, Virginia, and as set forth in the accompanying certification incorporated by reference herein, purchased SAExploration securities during the Class Period and was economically damaged thereby.

35.     Defendant SAExploration provides seismic data acquisition, logistical support,

and processing and integrated reservoir geosciences services in North America, South America, the Asia Pacific, and West Africa. SAExploration is a Delaware corporation and its principal executive offices are located at 1160 Dairy Ashford Road, Suite 160, Houston TX 77079. SAExploration securities trade on the NASDAQ under the ticker symbol "SAEX."

36.     Defendant Jeff Hastings ("Hastings") was the Company's Chairman of the Board from 2011 and Chief Executive Officer ("CEO") from August 2016 until he was placed on administrative leave on August 22nd, 2019. He subsequently resigned effective November 30, 2019 from both positions, but he continued as a management consultant to the Company until December 31, 2019.

37.     Defendant Brian A. Beatty ("Beatty") was the Company's CEO from June 2013 until August 2016. Beatty was the Company's Chief Operations Officer and a member of its Board of Directors from the beginning of the Class Period until August 2019, when he was placed on administrative leave and resigned as Chairman of the Board. Beatty remained on leave until December 30, 2019, when his employment was terminated and he was deemed to resign from the Board pursuant to his employment agreement with SAExploration.

38.     Defendant Brent Whiteley ("Whiteley") was the Company's Chief Financial Officer ("CFO") and General Counsel from the beginning of the Class Period until he was terminated on August 22, 2019.

39.     Defendant L. Melvin Cooper ("Cooper") has been a member of the Board of Directors and a member of the Audit Committee of SAExploration since mid-2016.

40.     Defendant Gary Dalton ("Dalton") has been a member of the Board of Directors and a member of the Audit Committee of SAExploration since 2013.

41.     Defendant David D. Sgro ("Sgro") was a member of the Board of Directors and a

member of the Audit Committee of SAExploration from 2013 until resigning effective July 27, 2016.

42.    Defendant Gregory R. Monahan ("Monahan") was a member of the Board of Directors and a member of the Audit Committee of SAExploration from 2013 until resigning effective July 27, 2016.

43.    Defendant Michael Faust ("Faust") has been a member of the Board of Directors of SAExploration and Lead Member of the Audit Committee since 2017. In August 2019, with the departure of Defendant Hastings, he was appointed Chairman of the Board and Interim President. He currently serves as Chairman, President and Chief Executive Officer.

44.    Defendants Sgro, Monahan, Cooper, Dalton, and Faust (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the integrity of the Company's financial statements, the Company's compliance with laws and regulations, and the Company's accounting and financial reporting practices and system of internal controls. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and internal controls, as they are charged to do under the Audit Committee Charter, allowing the Company to issue false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants failed to exercise adequate oversight over SAExploration's activities and financial reporting during the Class Period.

45.    According to the Audit Committee Charter, the Audit Committee of SAExploration has the following responsibilities:

The Audit Committee shall:

*…Review and discuss with management and the independent auditor, as appropriate, significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements*, including:

(a) *any significant changes in the Company's selection or application of accounting principles*;
(b) *all critical accounting policies and practices* to be used in the audit;
(c) *all alternative treatments of financial information within GAAP* that have been discussed with management, the ramifications of the use of such alternative treatments and the treatment preferred by the auditor;
(d) *any major issues as to the adequacy of the Company's internal controls and any special steps adopted in light of material control deficiencies*…

*…Review with management and the independent auditor any major issues regarding accounting principles and financial statement presentation*, including any significant changes in the Company's selection or application of accounting principles; *any significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements*…

*… Discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures*, including the Company's risk assessment and risk management policies.

*… Review disclosures made to the Audit Committee by the Company's Chief Executive Officer and Chief Financial Officer (or individuals performing similar functions) during their certification process for the Form 10-K and Form 10-Qs about any significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting and any fraud involving management or other employees who have a significant role in the Company's internal control over financial reporting*.

*… Obtain assurance from the independent auditor that Section 10A(b) of the Exchange Act has not been implicated*.

*… Review, approve and oversee any transaction between the Company and any related person… and any related party transaction or other potential conflict of interest situations on an ongoing basis*…

*… Review with management and the independent auditor the adequacy and effectiveness of the Company's financial reporting processes, internal control over financial reporting and disclosure controls and procedures, including any significant deficiencies or material weaknesses in the design or operation of, and any material changes in, the Company's processes, controls and*

13

*procedures … and review and discuss with management and the independent auditor disclosure relating to the Company's financial reporting processes, internal control over financial reporting and disclosure controls and procedures*, the independent auditor's report on the effectiveness of the Company's internal control over financial reporting (if applicable) *and the required management certifications to be included in or attached as exhibits to the Company's annual report on Form 10-K or quarterly report on Form 10-Q*, as applicable…

*… Inquire and discuss with management the Company's compliance with applicable laws and regulations and with the [Code of Conduct] in effect at such time and, where applicable, recommend policies and procedures for future compliance.*

*… Review with management and the independent auditor the adequacy and effectiveness of the Company's financial reporting processes, internal control over financial reporting and disclosure controls and procedures, including any significant deficiencies or material weaknesses in the design or operation of, and any material changes in, the Company's processes, controls and procedures …and the required management certifications to be included in or attached as exhibits to the Company's annual report on Form 10-K or quarterly report on Form 10-Q….*

(emphasis added).

46.    In violation of the Audit Committee Charter and the Code of Conduct, the Audit Committee-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including issuing false and misleading annual and quarterly reports with the SEC in violation of Section 10(b) of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, protect and properly use corporate assets, and properly report violations of the Code of Conduct.

47.    Defendants Hastings, Beatty, Whiteley, Sgro, Monahan, Cooper, Dalton, and

Faust are collectively referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of SAExploration's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

48.     Each of the Individual Defendants:

a)  directly participated in the management of the Company;

b)  was directly involved in the day-to-day operations of the Company at the highest levels;

c)  was privy to confidential proprietary information concerning the Company and its business and operations;

d)  was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e)  was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

15

f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

g) approved or ratified these statements in violation of the federal securities laws.

49. SAExploration is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

50. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to SAExploration under *respondeat superior* and agency principles.

51. Defendant SAExploration and the Individual Defendants are collectively referred to herein as "Defendants."

**SUBSTANTIVE ALLEGATIONS**
**Background on SAExploration and Defendants Hastings and Whiteley**

52. SAExploration is a geophysical services company offering seismic data acquisition services—in other words, collecting geospatial data on seismic activity—principally to the oil and gas industry in North America, South America, and Southeast Asia. It began operations in Lima, Peru in 2006, where it was then called South American Exploration. It expanded to Colombia in 2008, and later to Bolivia, Papua New Guinea, and Australia in 2010. It changed its name to SAExploration, Inc. and incorporated in Delaware in 2011. The same year, it established North American seismic activities with the acquisition of Datum Exploration in Calgary, Canada and Northern Exploration Services, Inc. (now called NES, LLC) ("NES") in Anchorage, Alaska. It subsequently established operating subsidiaries in New Zealand and Brazil, and in 2013, its shares were listed on the NASDAQ Capital Market under the symbol

SAEX. It established its current corporate headquarters in 2014, in Houston, Texas.

53.    With its 2011 acquisition of NES, LLC ("NES"), d/b/a Northern Exploration Services, in 2011, SAExploration also established a business relationship with its prior managing partner, Jeffrey Hastings. NES was founded in or around 2006 by Jeff Hastings as manager (and Lori Hastings as sole member), with its initial registered address at 4721 Golden Spring Circle, Anchorage, Alaska 99507—Jeff Hastings' Alaska home. In 2011, its physical address was 8240 Sandalwood Place, Suite 201, Anchorage, Alaska 99507, which became SAE's Anchorage office.

54.    In 2015, SAExploration listed NES as a guarantor in a $150 million note offering SAExploration registered with the SEC. The documents refer to "NES, LLC" only in naming it as a party to them. They drew no connection between NES, LLC and the entity referred to in previous filings only as "Northern Exploration Service, Inc."

55.    In August 2016, Jeff Hastings was appointed CEO. Between 2016 and 2019, Defendant Brent Whiteley, as SAExploration's Chief Financial officer and General Counsel, executed several loan and guarantee agreements which were filed with the SEC, in which he signed for both SAE and NES. Hastings, Whiteley, and Beatty signed and certified these filings. Nowhere did they disclose that this was the same company owned by, and acquired from, its sitting CEO. In fact, this relationship was not disclosed until February of 2020.

**Hastings and Whiteley's Rich History of Fraud and Embezzlement**

56.    Interviews with confidential informants have revealed that Hastings had a history of unsavory business practices. Confidential Informant #1 reports that associates in Alaska knew him as a man "with his hand in a lot of gigs." While he was principally responsible for SAExploration's Alaska operations, he maintained a number of side hustles—business ventures

17

that he owned and controlled himself, and which he routinely used to conduct self-dealing transactions in which he converted SAExploration's resources to his own benefit. Confidential Informant #1, who served as a Project Manager with SAExploration in Alaska between 2014 and 2016, and Confidential Informant #2, another Alaska-based Project Manager between 2012 and 2015, report that Hastings habitually used SAExploration personnel and equipment to perform work for his side businesses, and even for himself—for example, having several Company employees erect and paint a fence on his personal property. He also routinely leased used equipment from a business he owned to SAExploration at inflated prices—including snowmobiles and similar off-road equipment which he had originally purchased for use by himself and his family. One person who worked with Hastings in Alaska, Confidential Informant #2, relates that Hastings oversaw a workplace culture in which he and other connected employees would "purchase" heavy equipment from SAExploration only to immediately lease it back to the Company for far more than the "purchase" price. He was also known for engaging in dishonest bidding practices in order to obtain business from rivals in the space. In 2013, Hastings misappropriated approximately $500,000 from SAExploration as reimbursement for his personal tax liability, which SAExploration reported as tax expense in its contemporaneous filings.

57.     One of Hastings' connections was with Defendant Michael Faust, then an executive at ConocoPhillips, who routinely directed ConocoPhillips' seismic contracts in the Alaskan North Shelf to SAExploration, bypassing the customary bidding process and freezing out the Company's competitors,  according to  Confidential Informant #3—who between 2012 and 2018 was the CEO of a Texas-based company that had extensive dealings with SAExploration and the Individual Defendants. Faust went on to serve as a director of SAExploration and Lead Member of its Audit Committee, from 2017 through 2019, and today

serves as Chairman, President, and CEO of the Company.

58.     Hastings used his position as CEO to expand the scope of his self-dealing, directing SAExploration's business to various vendors he controlled and diverting corporate funds for his own benefit.  Two of these companies were Fairweather Science, LLC—a company ostensibly providing specialized environmental support services in Alaska—and Fairweather, LLC—a company providing aviation weather observation services in Alaska. SAExploration paid both of these entities for unspecified services in 2017 and 2018. SAExploration was required to disclose such self-dealing as related-party transactions pursuant to U.S. GAAP. SAExploration did not identify these as related-party transactions or disclose that these purported vendors were owned and controlled by Defendant Hasting until February 7th, 2020.

59.     While Hastings was bilking the Company in Alaska, then-CFO and General Counsel, Brent Whiteley was studiously employing independent schemes to separate SAExploration from its money. Whiteley embezzled funds by creating sham vendors—owned and controlled indirectly by him—and billing the company for rental expenses and consulting services that were never actually rendered. One such vendor was RVI Consulting, Inc. ("RVI"), which on information and belief, is a Canadian corporation organized and existing under the laws of the province of Alberta, Canada, and secretly controlled by Whiteley.  Whitely used RVI to bill SAExploration for legal and professional expenses totaling approximately $4.1 million between 2012 and 2019. SAExploration revealed in its February 7, 2020 Restatements that these funds were actually embezzled, and they reclassified the expenses as losses from misappropriation of funds. Whiteley also billed the Company for services performed for his own benefit, including at least $100,000 paid to Woodstone Builders, LLC ("Woodstone"), which was controlled by Whiteley and/or his spouse. SAExploration reported this as capitalized cost for

leasehold improvements in its FY 2018 filings. Plaintiffs' investigation has revealed that this charge was likely for improvements to Mr. Whiteley's personal residence at 11 Crestwood Drive, Houston, TX 77007.

60.     Whiteley was also responsible for forming Speculative Seismic Investments, LLC ("SSI"), a Texas limited liability company formed in 2016. Its listed headquarters are at 11 Crestwood Drive—Defendant Whiteley's personal residence, once again. Its Registered Agent is Defendant Whiteley. SSI owns at least 1,350 shares of SAExploration's stock and was a lender under its senior loan facility in the amount of $0.6 million. SSI's managing Member was CLCH, LLC ("CLCH"), an Alaska limited liability company with its listed address at 4721 Golden Spring Circle, Anchorage, AK 99507—Defendant Hastings' Alaska home. CLCH, in turn, owns at least 1,201 shares of SAExploration' s stock. Another member of SSI was Ryan Abney ("Abney"), who was SAExploration's Vice President of Finance from the beginning of the Class Period until his dismissal in 2019.

**Alaska Seismic Ventures: SAExploration's Golden Ticket on Alaska's North Slope**

61.     In late 2014, a profound downturn in the price of oil—from $114.33/barrel in June 2014 to $53.40/barrel in January 2015—threatened to sink SAExploration's already struggling business. The demand for exploratory seismic services plummeted as the global petroleum industry contracted investment. SAEX's share price collapsed, losing nearly 60% of its value over the same period.

62.     Whiteley and Hastings knew they needed to act fast if they were going to keep the gravy train rolling. SAExploration had, until then, worked primarily on contract with larger oil & gas companies. They hit upon a plan: why not generate a little business themselves?

63.     In 2015, Hastings and Whiteley constructed a transaction in which they created a

so-called "Transfer Fee" of $12 million, ostensibly owed by SAExploration to Hastings in relation SAExploration's acquisition of NES from him back in 2011.

64.     Around the same time, Hastings and Whiteley formed Global Equipment Solutions, LLC, d/b/a Global Seismic Equipment Solutions, LLC ("Global Equipment"), as a Texas LLC. [1] Hastings assigned the right to collect the "transfer fee" to the newly created Global Equipment. SAExploration paid the $12 million to Global Equipment, reporting it in its contemporaneous financial reports and SEC filings as rental expenses.

65.     Of this $12 million, $5.9 million was transferred as a capital contribution to ASV. SAExploration's auditors have thus far been unable to track the remaining $6.1. million, but it was presumable converted to Hastings and/or Whiteley's personal use. The Company wrote it off as a loss to misappropriation of funds in its February 7, 2020 Restatement.

66.     In the same time frame, Hastings and Whiteley also formed Alaskan Seismic Ventures, LLC ("ASV") through a series of related entities. ASV was ostensibly owned by Palmyra Energy Holdings, LLC ("Palmyra Energy"), a Texas LLC. [2] Palmyra's listed headquarters, according to its public filings, was located at 6 Marilane Street, Houston, TX 77007. A cursory investigation reveals that this address leads to a private drive on the grounds of 11 Crestwood Drive, an $8.5 million mansion which was Whiteley's personal residence. [3]

67.     ASV's reported managing member is William Van Dyke ("Van Dyke"), an

---

[1] It was registered to the same Dallas address (an office of CT Corporation System) associated with Forza Investments Management, LLC ("Forza"), discussed in a subsequent paragraph. Global Equipment's registered manager was Whitney Burchfield ("Burchfield"), whose listed address is a P.O. Box in Hammond, Louisiana. Burchfield (maiden name Zahn) is a relative or associate of Brent Whiteley through his ex-spouse, Thomas O'Neill ("O'Neill") Whiteley and O'Neill were divorced in December of 2019.
[2] Palmyra is ultimately controlled by Mr. Whiteley and another individual--Vlad Bayer ("Bayer"), a private equity promoter based in Houston, Texas. Palmyra Energy appears to have had no substantive operations.
[3] Palmyra Energy's listed mailing address—5535 Memorial Drive, St. F662, Houston, TX 77007—is a postal box at a local UPS Store. Palmyra Energy was in turn controlled by Forza Investments Management, LLC ("Forza"), another Texas LLC, whose registered address was the Dallas office of CT Corporation System, a commercial agent for service of process. Forza had no headquarters and no substantive operations, and was owned and controlled by Whiteley, Bayer, and the same Whitney Burchfield associated with Global Equipment.

acquaintance of Hastings who was a petroleum engineer with decades of experience in the state of Alaska's Department of Natural Resources, Division of Oil & Gas. He served as the Acting Director of that division from 2005-2007, when he was apparently forced out with a change in political leadership. During the Class Period, Van Dyke resided at 4430 Mitzie Court, Wasilla, Alaska 99654. According to its corporate filings, ASV is headquartered at the same residence.

68.    Once the initial investment in ASV was in place, Van Dyke and/or Hastings, Whiteley, SAExploration, and their respective agents and employees, began applying for and "certificating" Alaska Exploration Credits to raise operating capital, while at the same time, "negotiating" to hire SAExploration to collect seismic data on its behalf.

69.    To collect this data, SAExploration sends large crews of 50 to 200 personnel on long-term assignments to remote areas of the Alaskan wilderness, where they set up camps from which they deploy seismic triangulation devices (colloquially called "vibrators") which collect data on seismic activity between set points, so that it can be compared across points to map out the landscape for purposes of identifying likely sites for petroleum exploration and extraction. Such crews would live in trailers on-site for months at a time, and all supplies were brought in through SAExploration's Site Managers, who were responsible for logistics, among other duties.[4]

70.    Such expeditions are costly to mount, and it seems unlikely that Hastings and Whiteley would have SAExploration—which was already generating deep losses from its legitimate operations—to absorb the expense of deploying independent crews to collect this speculative data.

71.    Based on the investigation of counsel—including interviews with knowledgeable

---

[4] Confidential Informant #1, Confidential Informant #2.

confidential informants [5]—Plaintiffs believe that SAExploration collected seismic data for ASV by "piggybacking" on its legitimate data-gathering expeditions funded by other customers. Industry insiders report that it would be simple for SAExploration's crews to deploy additional "vibrators" to collect speculative data for ASV at the same times and in the same places they deployed equipment for other, legitimate customers. "You're not supposed to have the information (gathered for clients) for resale purposes," reports Confidential Informant #4—who served as the CFO of a Texas-based company that dealt extensively with SAExploration in 2015 through 2018, "But if you're placing records in the grounds (to take seismic measurements) you could certainly put another record down there and make a copy." Alternatively, Whiteley and Hastings could have simply duplicated and misappropriated data collected for other customers to contribute to ASV's library—though the illegitimate source of such data would likely be more difficult to conceal.

72.    The seismic data SAExploration collects is ordinarily treated by the exploration & production ("E&P") firms that form the backbone of SAExploration's business as ***highly*** proprietary and confidential. Such data is difficult and expensive to collect, and people familiar with the industry say that the revelation that a seismic services provider had duplicated and marketed such data on its own account would be regarded as a grave betrayal of trust, and would likely represent a material breach of contract which could lead to litigation and/or the termination of existing and future business with the responsible firm.

73.    SAExploration recorded revenue on transactions with ASV on receivable, recording an asset (Accounts Receivable, or "A/R") in equal amount. Under ordinary circumstances, a business providing goods or service on receivable would expect prompt

---

[5] Confidential Informant #3, Confidential Informant #4.

payment (ordinarily between 30 and 90 days). However, as ASV was essentially a shell with no assets outside of the original $5.9 million capital contribution diverted from SAExploration, and its recorded applications for a certificate of Alaska Exploration Credits, it lacked the funds to support payments, outside of its ability to monetize those credits.

74.     ASV became one of SAExploration's largest customers during FY 2015 and 2016, accounting for up to 33% of its reported revenues during those periods. ASV accumulated a "library" of this seismic data, which it attempted to market to oil companies and related businesses, but as the price of oil continued to flag, it met with little success. As ASV was able to collect on its credits, it used a portion of the funds received to fund payments to SAExploration. The payments SAExploration did record were paltry in comparison to the amounts of receivables they carried, but because Hastings and Whiteley controlled both the Company and ASV (and fully understood the fraudulent nature of the relationship) they could ensure that SAExploration carried these receivables for extended periods of without raising too many questions, so long as *some* payments were coming through –just enough to avoid rousing too much suspicion.

75.     Hastings and Whiteley's plan hit a snag, however. As flagging petroleum prices exerted downward pressure on tax revenues, the Alaska Department of Resources ("DOR") was receiving rapidly diminishing appropriations to fund incentive payments under the Exploration Credits program. As a result, the DOR had been paying progressively less than the statutory formula would imply for those credits as time went on. The specific credit program ASV was exploiting was repealed effective January 1, 2018. In June of 2018, Alaska passed legislation permitting the DOR to issue bonds to finance repurchase of Exploration Credit certificates, but the program was subsequently tied up in litigation. There has not been a meaningful appropriation to fund payment of still-outstanding credits since 2018, when the state

appropriated approximately $77 million—against an outstanding balance of credit certificates valued at ***$470 million***, Today, there may be as much as $900 million in such credits outstanding, with no evident source of funds to redeem them.

76.     ASV went from being one of SAExploration's top 3 customers to a curious collections problem, accounting for up to $130 million in unpaid (and rapidly aging) accounts receivable, representing 93% of SAExploration's outstanding receivables as of December 2017. To help forestall the reckoning, Whiteley and Hastings had ASV assign Alaska tax certificates and applications with a face value of $89 million to SAExploration as security, which had the effect of placing those problematic assets directly on SAExploration's books.

77.     As Alaska whittled down appropriations for repurchase of its tax credits, SAExploration had no more luck than ASV in monetizing them. To avoid setting off alarm bells, SAExploration was forced to start taking a modest allowance for bad debts and include a lengthy risk disclosure in its Form 10-K Annual Report for Fiscal Years ("FY") 2017 and 2018 describing the trouble its "customer" (unnamed, but later revealed to be ASV) was having monetizing  Alaska tax credits to pay down its accounts. The truth was becoming progressively more difficult to hide.

### The Truth Begins to Emerge

78.     On Friday, November 4, 2016, the Company released its Form 10-Q for the third quarter of 2016 ("3Q16"). The Company's reported financial performance for that period displayed a dramatic turn for the worse, with the decline attributable entirely to a collapse in reported earnings from the North American market.

79.     The 3Q16 10-Q revealed that the bulk of the Company's accrued accounts receivable were derived from a single, unnamed "customer", and that significant concerns

existed regarding the collectability of those receivables due to the customer's "inability to monetize… Tax credits…":

**NOTE 3 — CREDIT CONCENTRATION**
*At September 30, 2016, the Corporation's largest account receivable from one customer was $92.5 million, representing 81% of total consolidated accounts receivable.* …

*…Due to the customer's inability to monetize the Tax Credits associated with the accounts receivable, it assigned to the Corporation $51.6 million of Tax Credits on April 22, 2016 and an additional $21.3 million of Tax Credits on July 27, 2016, so that the Corporation can seek to monetize these Tax Credits and apply the resulting cash, as monetization occurs, toward the customer's repayment of its overdue account receivable.* The Corporation expects the customer to assign to it the remaining Tax Credits once the applications for those Tax Credits have been applied for, which, by statute, cannot be submitted before January 1, 2017. Based upon the expected timing to monetize the Tax Credits as of September 30, 2016, the Corporation has reclassified $38.0 million from accounts receivable, net to accounts receivable, net, noncurrent in the September 30, 2016 condensed consolidated balance sheet.

In its review of approximately $30.2 million of Tax Credit applications during the audit process, the Corporation received approximately $24.4 million of Tax Credit certificates from the State of Alaska during the three-month period ended September 30, 2016.  The State of Alaska disallowed approximately $5.8 million of what the Corporation believes should otherwise be eligible expenditures. The Corporation's customer filed an appeal of this decision on October 18, 2016 and intends to seek a reversal of the disallowed amount. During the three months ended September 30, 2016, the Corporation recorded a reduction of the accounts receivable balance of $2.7 million related to the start of the monetization of Tax Credits. The Corporation recorded an additional $6.5 million reduction of the accounts receivable balance related to the further monetization of Tax Credits in October 2016. The Corporation still expects additional Tax Credit certificates from the State of Alaska representing approximately $60.5 million to be issued on a rolling basis over the next twelve months.

*There continues to be uncertainty regarding the timely payment by the State of Alaska of its obligations on issued Tax Credit certificates as well as the Corporation's ability to accurately estimate the timeframe for such payments.* The Corporation continues to explore options to monetize the Tax Credit certificates, including an option to sell the certificates in the secondary market at a discount to purchasers that are able to apply the certificates to reduce their own Alaskan tax liabilities. *There is a risk that any monetization of the Tax Credits certificates, however, will reflect a substantial discount and may be insufficient to fully repay the customer's outstanding account receivable. Should this occur,*

*the Corporation may be required to record an impairment to the amount due from the customer.*

Emphasis added.

80.     In the same 10-Q, SAExploration reported a complete collapse in revenues for services derived from operations in North America,  totaling $734,000 for the quarter—down from $57 million in immediate preceding quarter, and $56.3 million in the third quarter of FY 2015. The Company went from posting a modest net income from operations of $255,000 in the preceding quarter to a third-quarter loss of $17.4 million—over $40 per share in book losses (split-adjusted).

81.     Between November 4, 2016 and the subsequent trading day on Monday, November 7, the price of SAExploration's lost an astonishing 42% of its value, or approximately $40.39 per share, adjusted for the subsequent 20:1 reverse stock split on September 17, 2018. Trading volume was extremely high on both days as the market adjusted to the sudden and shocking revelation that SAExploration's key operations in Alaska had apparently collapsed, almost overnight.

82.     Unbeknownst to investors and to the market, this sudden and shocking decline in the Company's reported results of operation was in actuality the result of the sudden collapse of Defendants' fraudulent scheme to generate false revenues through sham contracts with the a single unidentified "customer"—which was, in actuality, ASV. While SAExploration's statements in its 3Q16 10-Q continued to be incomplete and materially misleading because they failed to reveal the identity of the "customer" as ASV, or the nature of the Company's true relationship with ASV, the sudden collapse of sham revenues reported in previous periods caused a significant correction of price inflation in SAExploration's stock resulting from the underlying fraud, damaging investors.

83.     After close of trading on August 21, 2017, SAExploration released its form quarterly report on Form 10-Q for the second quarter of FY 2017 (the "2Q17 10-Q"). The 2Q17 10-Q revealed another sudden and substantial decline in reported income from operations, reporting a loss for the quarter of over $17 million—against an operating profit of over $6 million for the first quarter of 2017. This decline was attributable principally to a drop in revenue from service in North America of $13.9 million—approximately 90.7%—from the same period in the prior year.

84.     On the subsequent trading day, August 22, 2017, the Company's stock price declined by approximately 15.1%, or $6.17 per share (split-adjusted), further damaging investors.

85.     After market close on March 25, 2019, SAExploration released its 10-K for FY 2018. The Company reported a massively-increase net loss of $82.7 million, up from $38.8 million in FY 2017, which was in large part a result of as $19.5 million charge to selling & general administrative expenses ("SG&A") as allowance for doubtful accounts, related to SAExploration's continuing difficulty "monetizing" the Alaska tax credits that supported its single largest account carried receivable, related to ASV.

86.     On the subsequent trading days, March 26 and 27 of 2019, SAExploration's price dropped from a previous-day closing price of $4.02 to $3.66 and $3.32, respectively, losing approximately 8.96% and 9.29% on each day, respectively.

87.     On August 15, 2019, the Company announced in a press release that the SEC was conducting an investigation into certain accounting matters that arose in 2015-2016. The Company also announced that it would restate its previously issued financial statements for fiscal years 2015-2018 and delay filing its 10-Q for the quarter ended June 30, 2019. The Company

further announced that Defendant Hastings had been placed on administrative leave and resigned

as Chairman, and that Defendant Whiteley had been terminated. The press release, stated, in

relevant part:

> HOUSTON, Aug. 15, 2019 /PRNewswire/ -- SAExploration Holdings, Inc. (NASDAQ: SAEX, OTCQB: SXPLW) ("SAE" or the "Company") announced today that **the Securities and Exchange Commission (the "SEC") is conducting an investigation of the Company relating to certain accounting matters that arose in 2015-2016**. The Company has been cooperating, and will continue to cooperate, in good faith with the SEC and has retained legal counsel and an accounting advisor to assist the Company with respect to this matter. The Company's Board of Directors has established a Special Committee of independent directors to oversee the Company's own internal investigation and response to the SEC.
>
> **The Company will restate its previously issued financial statements for the fiscal years ended December 31, 2015 - 2018 and for the quarters starting ended June 30, 2015 - March 31, 2019 (collectively, the "Non-Reliance Periods") and, as a result, will delay filing its 10-Q for the quarter ended June 30, 2019. As a result, the financial statements for the Non-Reliance Period should no longer be relied upon.** The Board's decision to restate these financial statements arose from the Company's re-evaluation of its relationship with Alaska Seismic Ventures, LLC ("ASV"). **The Company has determined that ASV was a variable interest entity and that the Company had a controlling financial interest in ASV that required it to consolidate ASV during the Non-Reliance Periods in accordance with accounting principles generally accepted in the United States. As a result of the above, the Company has determined that a material weakness exists in the Company's internal control over financial reporting and that disclosure controls and procedures were ineffective during the Non-Reliance Periods.** Accordingly, the Company will amend any disclosures pertaining to its evaluation of such controls and procedures as appropriate in connection with the restated filings. ASV is a data library company and the Company performed seismic services for ASV in 2015 and 2016. The need for restatement does not arise from SAE's current operating activities. The Company's Audit Committee has discussed the foregoing matters with Pannell Kerr Forster of Texas, P.C., the Company's independent registered public accounting firm, who supports the Company's determination. In connection with the restatement, the Company is in discussions with holders of a majority of its outstanding debt, as to whether or not there are defaults under the debt agreements, with the goal of agreeing to a path forward in a way that is constructive for the Company, its shareholders and employees, and the debt holders.

> *Michael Faust has been named Chairman of the Board, replacing Jeff Hastings, who has been placed on administrative leave and resigned as Chairman of the Board. The Company expects to name a new Chief Executive Officer in the near future. Kevin Hubbard, C.P.A. and Partner at Ham, Langston & Brezina, has been named Interim Chief Financial Officer, replacing Brent Whiteley, who has been terminated.*

> "We have taken swift action on each of these matters and will continue to do so until they are resolved," said Michael Faust, Chairman of the Board. "This does not impact our day-to-day operations which have been delivering outstanding results for our customers and investors. We remain committed to our customers, whose missions we make our own, and we are grateful to the devoted men and women of SAExploration and the contributions they make every day to our customers and our company. We have a strong pipeline of committed projects, an excellent team to deliver those projects, and are poised for continued success."

> (Emphasis added.)

88.     On this news, the Company's shares fell $1.13 per share or over 34% to close at $2.14 per share on August 16, 2019, damaging investors. Trading volume on that date was unusually high.

89.     On February 7, 2020, SAE restated its audited annual financial statements for financial years ended December 31, 2018, 2017, 2016, 2015, and 2014, and each of the Company's quarterly reports for the periods ending March 31, 2019, June 30, 2019, and September 30, 2019.

90.     Each of the Restatements contained substantially identical disclosures of the findings of the Company's internal investigation to date, which stated as follows:

> As previously disclosed, the SEC has been conducting an investigation of certain matters, including with respect to revenue recognition, accounts receivable and tax credits. The Department of Justice (the "DOJ") is conducting a parallel investigation with the SEC. We have been cooperating and will continue to cooperate with the SEC and the DOJ in their investigations.

> On August 5, 2019, our Board of Directors (the "Board") established a special committee of independent directors (the "Special Committee") to oversee an internal investigation with respect to the SEC investigation and any related

matters. In turn, the Special Committee engaged its own legal and forensic accounting advisors, in addition to certain consulting services providers. …

**On August 14, 2019, the Audit Committee and the Board concluded that our previously issued consolidated financial statements and financial information relating to each of the fiscal years ended December 31, 2015, 2016, 2017 and 2018 and our condensed consolidated financial statements for the quarters and year–to–date periods ended June 30, 2015 through March 31, 2019 (collectively, the "Non–Reliance Periods") contained errors, should no longer be relied upon and should be restated, and that other financial information, any earnings releases, investor presentations or other communications related thereto covering the Non–Reliance Periods should also no longer be relied upon**. The Audit Committee's and the Board's decision to restate our consolidated financial statements for the Non–Reliance Periods **arose from our re–evaluation of our relationship with Alaskan Seismic Ventures, LLC ("ASV"), which had not been consolidated into our financial statements. In August 2019, we determined that ASV is a variable interest entity ("VIE"), that we had a controlling financial interest in ASV, and that we are the primary beneficiary of ASV, which, among other factors, required us to consolidate ASV during the Non-Reliance Periods in accordance with GAAP**.

… **The Special Committee's investigation identified that Global Equipment Solutions LLC ("Global Equipment"), one of our vendors in 2015 and 2016, was formed by Brent Whiteley, our former Chief Financial Officer and General Counsel, and controlled by Mr. Whiteley and/or Jeff Hastings, our former Chief Executive Officer. In 2015 and 2016, we paid an aggregate of approximately $12.0 million to Global Equipment pursuant to the following agreements**. In August 2011, we entered into an agreement (the "Transfer Agreement") with NES, LLC ("NES"), pursuant to which NES retained a transfer fee (the "Transfer Fee") in connection with the transfer of a customer contract from NES to us. NES is a legal entity that was previously owned and/or controlled by Mr. Hastings that we subsequently acquired in October 2011. **The Transfer Fee was assigned to a separate legal entity controlled by Mr. Hastings prior to our acquisition of NES in October 2011 and was subsequently assigned to Global Equipment. The authenticity of the Transfer Agreement and the subsequent assignments of the Transfer Fee have not been confirmed. Furthermore, the foregoing arrangements and the obligation to pay the Transfer Fee to NES, Global Equipment and/or Mr. Hastings was not disclosed.** The payments made to Global Equipment in satisfaction of the purported Transfer Fee were previously recorded as rental expense in 2015 and 2016. **These amounts have now been reclassified in our consolidated statement of operations as loss from misappropriation of funds in 2015 and 2016.**

**Of the approximately $12.0 million paid to Global Equipment, approximately $5.9 million was transferred through entities formed and/or controlled by Mr. Hastings and Mr. Whiteley to ASV as capital contributions in December 2015.**

31

***This investment in ASV was not disclosed.*** ASV was formed as a seismic data library company in 2015, and the Company previously reported revenue from ASV of approximately $57.3 million in 2016 and approximately $83.8 million in 2015. ***The remaining approximately $6.1 million paid to Global Equipment was transferred to Mr. Hastings and Mr. Whiteley and/or to entities formed and/or controlled by them. These payments were not disclosed.***

***The Special Committee's investigation also identified the misappropriation of approximately $4.1 million by Mr. Whiteley from 2012 to 2019, which amount has been reclassified in our consolidated statement of operations as a loss from a misappropriation of funds for such periods****. A portion of these funds were paid to RVI Consulting, Inc. ("RVI"), a legal entity owned and/or controlled by Mr. Whiteley. The payments made to RVI were not disclosed. The majority of the payments to RVI were previously recorded as legal and professional expenses in the prior periods.*

91.     The restatements also delivered news that the reclassification of ASV as a VIE would lead to a reduction in shareholder's equity, as follows:

**Effects of the Restatement**

As a result of the determination that ASV is a VIE, in which we have a controlling financial interest and are the primary beneficiary, we are consolidating ASV for all periods beginning in 2015. ***The consolidation of ASV as of December 31, 2018 resulted in a reduction of stockholders' equity of approximately $34.0 million due to the consolidation and elimination of inter-company transactions****. The assets of ASV consist of a seismic data library in Alaska for which we provided the seismic data acquisition services, tax credits received from the State of Alaska under the rebatable oil and gas production tax credit regime and cash on hand. The tax credits were recorded as a reduction in the value of the seismic data library as a reimbursement of the costs incurred to acquire the data library. ASV has no significant liabilities other than its payable to us for the seismic data acquisition services and has approximately $5.9 million in capital contributions as described above. **As of September 30, 2019, considering the approximately $34.0 million reduction in stockholders equity discussed above, the consolidation of ASV resulted in a decrease in stockholders' equity of approximately $1.1 million.**

***We have reclassified certain items in our consolidated statement of operations as loss from a misappropriation of funds disclosed above, of which approximately $55 thousand, $328 thousand, $265 thousand and $626 thousand, respectively, are related to the misappropriation of funds by Mr. Whiteley in the three and nine months ended September 30, 3019 and 2018, respectively. ...***

In connection with the restatement of our condensed consolidated financial statements … *management determined that material weaknesses exist in our internal control over financial reporting and that our disclosure controls and procedures were ineffective during the Non–Reliance Periods and as of September 30, 2019.* …

92.     They provided further detail regarding related-party transactions between SAE and several other entities owned and controlled by Whiteley and/or Hastings, including as follows:

> *Mr. Whiteley owns RVI.  In the three months ended September 30, 2019 and 2018, RVI billed us $55 thousand and $0.3 million for legal and professional services.  In the nine months ended September 30, 2019 and 2018, RVI billed us $0.3 million and $0.6 million, respectively, for legal and professional services. These payments were determined to be a misappropriation of funds, and are included in misappropriation of funds on our unaudited condensed consolidated statements of operations.*
> …
>
> *ASV is a VIE indirectly owned and/or controlled by Mr. Hastings and Mr. Whiteley* (see Note 2).

93.     The Restatements also disclosed for the first time the nature and extent of material weaknesses in SAE's internal controls during the "Non-Reliance Period" and the Class Period:

> The control environment, which is the responsibility of senior management, helps set the tone of the organization, influences the control consciousness of its officers and employees, and is an important component affecting how the organization performs financial analysis, accounting and financial reporting. … *We did not design or maintain a proper control environment or proper tone at the senior management level*.
>
> *We did not design or maintain effective monitoring activities and activities surrounding our control environment, which was primarily attributable to not performing ongoing evaluations*… [which] contributed to the following material weaknesses at the control activity level:
>
> - … We did not design or maintain effective controls over the review of revenue contracts for proper revenue recognition and accounts receivable reconciliations and the review of journal entries used to record revenue

transactions.

- … We did not appropriately design or maintain effective controls over complex accounting relating to variable interest entities or over the review and approval of entering into transactions with newly formed entities, which resulted in certain instances of incorrect accounting and improper consolidation decisions. …

- … We did not design or maintain effective controls to support accurate reporting and disclosures within our quarterly and annual reporting.

- … We did not design or maintain effective controls to ensure that necessary procedures regarding the establishment and maintenance of both customers and vendors were followed.

- …We did not properly disclose related parties in our consolidated financial statements and some of our officers and employees charged with making the proper notifications for such disclosures were inadequately trained on what constitutes a related party. Furthermore, there were instances where related parties were known to be related parties and were still not properly reported and disclosed.

- …We did not properly design or maintain effective controls to prevent unauthorized access to approve certain transactions, including appropriate analysis of segregation of duties conflicts. As a result of this failure, high level employees had the ability to approve transactions, and vendor set up and payments without necessary approvals at the transaction level and oversight at the Board level.

- … We did not design or maintain effective controls to prevent unauthorized access to certain systems, programs and data, and provide for periodic review and monitoring of access including review of security logs and analysis of segregation of duties conflicts.

94.     The Restatements detail numerous remediation measures being undertaken to correct the above acknowledged defect in SAExploration's internal controls going forward. Had Defendants implemented effective internal controls in the previous period, millions of dollars of embezzlement and significant losses to investors might have been avoided. Unfortunately, the Company's response is too little, too late.

95.     Based on Defendants' knowledge and participation in and active concealment of an ongoing embezzlement scheme, Defendants' financial statements and public disclosures concerning SAExploration's operations and the adequacy of its internal accounting and compliance-related controls were false and misleading throughout the Class Period and its stock price remained artificially inflated.

96.     Defendants knowingly made materially false and misleading statements or omissions about SAExploration's commitment to the highest ethical standards. In reality, SAE hid from investors that its revenues and results of operations materially false and misleading as a result of intentional misstatement and misclassification of funds being diverted to the personal use of Defendants Hastings and Whiteley as ordinary expenses. Worse, the Company's lax control environment and corrupt organizational culture subjected investors to heightened risks of investigations into its financial reporting and internal control procedures. This risk ultimately came to fruition through investigations by the U.S. Department of Justice ("DOJ"), U.S. Securities Exchange Commission ("SEC"), and Alaska Department of Revenue ("DOR").

97.     Specifically, Defendants knew but failed to disclose that:

(a) SAExploration's revenues were materially false and misleading, in that they mischaracterized and misclassified funds diverted to personal use by members of senior management as legitimate business expenses;

(b) SAExploration's financial statements violated Generally Accepted Accounting Principles ("GAAP") by failing to report ASV as a variable-interest entity;

(c) SAExploration did not maintain, implement, or enforce adequate internal controls over financial reporting or Company assets; and

(d) SAExploration  did not maintain, implement, or enforce adequate accounting controls to ensure the accuracy of SAExploration's books and records, including the fact that certain transactions were funneled to companies owned and controlled by members of senior management for their personal use, and its financial statements therefore failed to comply with GAAP.

98.     SAExploration failed to disclose these material weaknesses in its MD&As during the Class Period, and SAExploration's interim and annual MD&As during the Class Period were therefore materially misleading.

99.     In respect of the matters set out above, the Individual Defendants authorized, permitted or acquiesced in the misleading statements SAExploration made in its interim and annual MD&As relating to internal control during the Class Period.

100.    In addition, Defendants Hastings and Whiteley certified SAExploration's interim and annual MD&As during the Class Period which contained the materially misleading statements relating to SAE's internal controls.

101.    The Individual Defendants each authorized, permitted or acquiesced in SAExploration's failure to adhere to documented policies and controls for the reporting periods in which they were officers and/or directors respectively. This contributed to SAE making materially misleading disclosures in its annual and quarterly filings during the Class Period.

102.    These statements were materially misleading when made, as SAExploration and

the Individual Defendants each knew or had reason to know that SAExploration's internal controls and disclosure controls and procedures were not effective or reliable during the Class Period.

103.    The Hastings, Beatty, and Whiteley authorized, permitted or acquiesced in the misleading statements by SAE relating to the effectiveness of its internal controls and disclosure controls and procedures in its annual and quarterly financial filings during the Class Period.

104.    As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities following the above series of corrective disclosures, the market price of SAExploration's shares collapsed and Plaintiffs and other Class members were left holding the bag.

105.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## FALSE AND MISLEADING STATEMENTS ISSUED THROUGHOUT THE CLASS PERIOD

106.    Throughout the Class Period, Defendants made numerous materially false and/or misleading statements and omissions to investors regarding, among other things, losses from misappropriation of funds that were mischaracterized as legitimate transactions, material weaknesses in the Company's internal controls, and numerous undisclosed related-party transactions. These statements, which were repeated in the Company's various filings with the SEC, are detailed below.

107.    Despite Defendants' assurances to investors, the Company's FY 2015-2018 Forms 10-K materially misstated the Company's results of operations in several material respects.  As detailed herein, Defendants failed to report that SAExploration was actually the

owner of Alaska Seismic Ventures ("ASV"), which was also the source of a significant portion of its reported revenues from operations in Alaska. GAAP requires that such an entity be reported as a variable-interest entity ("VIE"), and its results of operations consolidated with those of the Company. As a result, none of the Company's reported revenue derived from work performed for ASV during the period should have been recognized, and its reported revenue from operations was materially overstated throughout the Class Period. Finally, and most damningly, SAExploration failed to disclose numerous and continuing instances of self-dealing which should have been reported as related-party transactions in conformity with GAAP, and misreported embezzlement of funds by Defendants Hastings and Whiteley and legitimate expenses paid to vendors and consultants.

108.    SAExploration restated its financial results for 2015, 2016, 2017, and 2018 in its Amended Form 10-K/A for FY 2018 (hereinafter, the "Restatement") on February 7, 2020. The Restatement also modified and restated certain data dating back to FY 2014.

109.    Generally, a restatement is "the process of revising previously issued financial statements to reflect the correction of an *error* in those financial statements." ASC-250-10-20 (emphasis added). An "error" is defined as "an error in recognition, measurement, presentation, or disclosure of the financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or *oversight or misuse of facts that existed at the time the financial statements were prepared.* A change from an accounting principle that is not generally accepted to one that is generally accepted is a correction of an error." ASC-10-20 (emphasis added). In contrast to a restatement, a change in estimate "result[s] from *new information*." (emphasis added)

110.    SAExploration's Restatement is an admission that the Company's originally

issued financial statements for Fiscal years 2015, 2016, 2017, and 2018, and all interceding quarterly financial statements embraced by those periods, contained material errors at the time they were issued. Further, by definition, the Restatement did not occur due to new information coming to light, but instead resulted from errors relating to facts existing at the time they were originally issued.

111.     The Company's accounting violations primarily related to seven categories:

1.  misstatements concerning presentation in conformity with U.S. Generally Accepted Accounting Principles ("GAAP");

2.  related misstatements and omissions concerning accounting for variable-interest entities ("VIEs"), including failure to identify and consolidate Alaska Seismic Ventures ("ASV") as a variable-interest entity;

3.  misstatements in SAExploration's results of operations, including Revenue, Operating Income (Loss), Net Income (Loss), Earnings Per Share; Working Capital, and Stockholder's Equity (Deficit);

4.  misstatements relating to growth and financial performance of SAExploration's operations in North America and Alaska;

5.  misstatements and omissions in reporting related-party transactions;

6.  Misstatements and omissions regarding SAExploration's internal controls; and

7.  false and materially misleading Sarbanes-Oxley Certifications.

**1.  Misstatements Regarding Presentation in Conformity with GAAP**

112.     During the Class Period, Defendants issued incomplete and materially misleading financial statements, which they falsely represented to be presented in conformity with U.S. GAAP.

113.    Each of SAExploration's annual Forms 10-K for FY 2016, 2017, and 2018 contained substantially identical representations that the Company's financial statements were presented in compliance with GAAP and that its internal controls and procedures were effective in all material respects.

114.    In each of its annual and quarterly filings, SAExploration represented that its financial statements were presented in conformity with U.S. GAAP and SEC rules and regulations. The following is the relevant language included, which was repeated in substantially the following form, in SAE's SEC filings regarding its conformity with GAAP:

115.    On August 7, 2015 (Q2 2015 10-Q), November 5, 2015, May 16, 2016, August 12, 2016, November 4, 2016, May 5, 2017, August 21, 2017, November 8, 2017, March 16, 2018, May 15, 2018, August 9, 2018, November 13, 2018, May 14, 2019[6]:

> **Basis of Presentation**
>
> The unaudited interim condensed consolidated financial statements of the Corporation as of March 31, 2016 and for the three months ended March 31, 2016 and 2015 included herein, *have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP")* for interim financial information and pursuant to the rules and regulations of the Securities and Exchange Commission ("SEC"). Although the financial statements and related information included herein have been prepared without audit, and certain information and note disclosures normally included in financial statements prepared in accordance with GAAP have been condensed or omitted, *the Corporation believes that the note disclosures are adequate to make the information presented not misleading*.

116.    In actuality, the Company's revenues, assets, and stockholder's equity were materially overstated, and its operating losses, net losses, and basic and undiluted loss per share were materially understated at all relevant times.

---

[6] The date and type of report (Form 10-Q or Form 10-K) reflected the period set forth in the relevant SEC filing in which the statements were made.

### 2. Misstatements Regarding ASV and Accounting for Variable Interest Entities

117.    The term "variable interest entity" as used by the United States Financial Accounting Standards Board (the "FASB") in its Accounting Standards Codification ("ASC") 810-10 generally refers to an entity in which a public company has a variable interest that is not based on having the majority of voting rights. VIEs are primarily entities that lack sufficient equity to finance their activities without financial support from others and/or whose equity holders, as a group, lack one or more of the following characteristics: ability to make decisions, obligation to absorb expected losses and right to receive expected residual returns.

118.    A public company is generally deemed to have a controlling financial interest in a VIE when it (i) has the power to direct the VIE's activities that most significantly impact the VIE's economic performance, and (ii) has the obligation to absorb losses of the VIE or the right to receive benefits from the VIE that could potentially be significant to the VIE.

119.    Variable interests in a VIE held by a public company and its related parties and de facto agents should generally be treated as one interest for purposes of determining who is the primary beneficiary. As the VIE's primary beneficiary, the public company is required to consolidate the VIE and include the VIE's assets, liabilities and results of operations in its consolidated financial statements.

120.    As SAExploration was the primary beneficiary of ASV, U.S. GAAP required it to consolidate ASV in reporting its results of operations. The effects of this failure to consolidate on SAE's stated results of operations were several:

121.    U.S. GAAP does not permit the primary beneficiary of an ASV to recognize revenue or loss on transactions with that ASV. SAE's failure to consolidate thus led it to improperly recognize revenue on contracts for services rendered to ASV. This caused SAE's revenues to be overstated by more than $130 million in FY 2015 and 2016.

122.    By failing to consolidate ASV's assets and liabilities, SAExploration reported as assets accounts receivable related to its transactions with ASV, leading to an overstatement of assets and concomitant overstatement of shareholder's equity during that period.

123.    Together, this would have revealed that amounts SAExploration was reporting as revenue were really just the proceeds of illusory transactions with itself. Thus, SAE's earnings, assets, and equity were significantly overstated.

124.    SAExploration issued a number of false and misleading statements concerning its relationship with ASV. In its FY 2016 Form 10-K, filed March 15, 2017, the Company included a lengthy and confusing Note 3 to its Consolidated Financial Statements, titled simply "Credit Concentration," concerning issues its "customer" (unnamed, but actually ASV) was having paying its *$81.6 million* in accounts payable, representing *76%* of SAExploration's total consolidated accounts receivable:

> *At December 31, 2016, the Corporation's largest account receivable from one customer was $81.6 million, representing 76% of total consolidated accounts receivable.* This customer was relying on monetization of tax credits under a State of Alaska tax credit program ("Tax Credits"), either from proceeds from the State of Alaska or from third party financing sources, to satisfy the accounts receivable. *There remains substantial uncertainty regarding the timing of reimbursement* from the State of Alaska…
>
> *Due to the customer's inability to monetize the Tax Credits, our customer assigned $72.9 million of Tax Credits during the year ended December 31, 2016 so that we can seek to monetize these Tax Credits* and apply the resulting cash, as monetization occurs, toward the customer's repayment of its overdue account receivable. *In January 2017, the customer assigned the remaining $16.1 million of Tax Credits to the Corporation.* ….
>
> …*There continues to be uncertainty regarding the timely payment by the State of Alaska of its obligations on issued Tax Credit certificates as well as the Corporation's ability to accurately estimate the timeframe for such payments.* The Corporation continues to explore options to monetize the Tax Credit certificates….

Emphasis added.

125.    SAExploration's FY 2016 Form 10-K also included a number of false and misleading statements concerning "Significant Accounting Policies": With respect to its reporting of the activities of subsidiaries and controlled entities, SAExploration stated:

**Principles of Consolidation**
The accompanying consolidated financial statements *include the accounts of SAExploration Holdings, Inc., its wholly-owned subsidiaries and controlled entities*. All significant intercompany balances and transactions have been eliminated upon consolidation.

The consolidated financial statements of the Corporation *have been prepared on the accrual basis of accounting in accordance with accounting principles generally accepted in the United States of America ("GAAP")*. ….

126.    This statement was, of course, incomplete and materially misleading, in that it represented to shareholders and the public that SAExploration was consolidating the results of all of its owned and controlled subsidiaries in its financial statements. In actuality, the Company was reporting ASV as a "customer" rather than a VIE subject to consolidation with its own results pursuant to U.S. GAAP.

127.    SAExploration's 2016 10-K said the following concerning accounting for variable-interest entities (VIEs):

**Variable Interest Entities**
*The Corporation evaluates its joint venture and other entities in which it has a variable interest (a "VIE"), to determine if it has a controlling financial interest and is required to consolidate the entity as a result*. The reporting entity with a controlling financial interest in the VIE will have both of the following characteristics: (i) the power to direct the activities of a VIE that most significantly impact the VIE's economic performance and (ii) the obligation to absorb the losses of the VIE that could potentially be significant to the VIE or the right to receive benefit from the VIE that could potentially be significant to the VIE...
…
**NOTE 15 — VARIABLE INTEREST ENTITIES**
Effective November 19, 2012, an agreement was entered into between a subsidiary of the Corporation and Kuukpik Corporation ("Kuukpik") to form a separate legal entity ("Joint Venture") for the purpose of performing contracts for the acquisition and development of geophysical and seismic data … The sole

source of revenue of the Joint Venture is contracts performed by the Corporation. … Risk of loss on a contract, including credit risk, is the Corporation's sole responsibility. ***Based on its power to influence the significant business activities of the Joint Venture and its responsibility to absorb contract losses, the Corporation was determined to be the primary beneficiary under GAAP and as such consolidates the Joint Venture***. The results of the Joint Venture are combined with the Corporation and all intercompany transactions are eliminated upon consolidation….

Effective October 18, 2016, an agreement was entered into between the Corporation and SAExploration Nigeria Limited ("SAE Nigeria") for the purpose of performing acquisition and development of geophysical and seismic data on a specific project in West Nigeria ("West Nigeria Project"). … ***Based on its power to influence the significant business activities of SAE Nigeria during the completion of the West Nigeria Project, its responsibility to absorb contract losses and the proportion of SAE Nigeria's operations dedicated to the West Nigeria Project at this time, the Corporation was determined to be the primary beneficiary under GAAP and as such consolidates SAE Nigeria for the term of the West Nigeria Project***. The results of SAE Nigeria are combined with the Corporation and all intercompany transactions are eliminated upon consolidation.

Emphasis added.

128.    These statements were incomplete and materially misleading, and omitted key facts necessary to render them not misleading, because (a) they falsely represented that SAExploration was timely "evaluating its joint venture and other entities" to determine whether they needed to be consolidated as a VIE, where in actuality, the Company knew or should have known at all that ASV was a VIE and should have been consolidated throughout the Class Period; (b) it described its evaluation and conclusion to consolidate operations for two other named VIEs, but omitted to disclose that ASV was also a VIE, or even that it considered whether ASV was a VIE and how it arrived at its conclusion, and the inclusion of discussion of other potential VIEs with ***no reference whatsoever*** to ASV would be expected to—and did—create the false impression in the minds of reasonable investors that ASV was not an entity in which SAExploration had "a controlling financial interest."

129.    With respect to Revenue Recognition, SAExploration said:

**Revenue Recognition**
… ***If it is determined that a contract will have a loss, the entire amount of the loss associated with the contract is immediately recognized***. … If we determine that the costs are not recoverable, ***the costs are expensed***…

Emphasis added.

130.   These statements were incomplete and materially misleading, and omitted key facts necessary to render them not misleading, because (a) they falsely represented that SAExploration was recognizing losses as soon as uncollectability became apparent, where in actuality, the Company was carrying tens of millions of dollars in accounts receivable from ASV which it knew or should have known were unlikely to ever be collected; (b) it omitted that it was actually recognizing tens of millions of dollars in revenue on sham transactions with ASV,  an entity that should have been accounted for as a variable-interest entity in accordance with U.S. GAAP; and (c) it falsely represented that the Company was recognizing losses when outlays were determined not to be recoverable, when in fact the bulk of SAExploration's reported receivables were false receivables from ASV, the collection of any significant portion of which SAExploration knew at the time was remote, or at best unlikely, and should have been written off or allowanced immediately.

131.   Concerning its accounting for accounts receivable and allowances for doubtful accounts, the Company represented:

**Accounts Receivable and Allowance for Doubtful Accounts**
Accounts receivable are uncollateralized obligations recorded at the invoiced amount and do not bear interest. Amounts collected on accounts receivable are included in net cash provided by operating activities in the consolidated statements of cash flows. … ***The Corporation maintains an allowance for doubtful accounts for estimated losses in its accounts receivable portfolio***. … Account balances are charged off against the allowance after all means of collection have been exhausted and ***the potential for recovery is considered remote***.
…
**Allowance for Doubtful Accounts**

We maintain an allowance for doubtful accounts for estimated losses in our accounts receivable portfolio. We utilize the specific identification method for establishing and maintaining the allowance for doubtful accounts. ***Account balances are charged off against the allowance after all means of collection have been exhausted and the potential for recovery is considered remote***. While the ***collectability of outstanding customer invoices is continually assessed***, the cyclical nature of our industry may affect our customers' operating performance and cash flows, impacting our ability to collect on the invoices. Some of our customers are located in certain international areas that are inherently subject to economic, political and civil risks, which may also impact our ability to collect receivables.

132.    These statements were incomplete and materially misleading, and omitted key facts necessary to render them not misleading, because (a) they failed to disclose the name of the "customer" to be ASV; and (b) it falsely represented that the Company was taking reasonable allowances for doubtful accounts and writing off receivables when collection became remote, when in fact the bulk of SAExploration's reported receivables were false receivables from ASV, the collection of any significant portion of which SAExploration knew at the time was remote, or at best unlikely, and should have been written off or allowanced immediately.

133.    SAExploration said the following concerning "Significant Risks and Uncertainties":

**Significant Risks and Uncertainties**
… the Corporation generally provides services and extends credit to a relatively small group of key customers that account for a significant percentage of revenues and accounts receivable of the Corporation at any given time .... ***As of December 31, 2016, a significant portion of our receivables are due from one customer as further described in Note 3.***
Emphasis added.

134.    This statement was incomplete and materially misleading, and omitted key facts necessary to render it not misleading, because (a) it failed to disclose the name of the "customer" to be ASV; (b) it omitted that ASV was actually controlled and operated for the benefit of SAExploration, and therefore was required by U.S. GAAP to be consolidated as a VIE; (c) it

46

represented that there was "risk" only as to the **concentration a "significant percentage" of receivables** on the account of a single client, when it knew at that time that the receivables were fraudulently reported, not reportable under U.S. GAAP, and that it was unlikely ever to collect the entire balance or even the majority thereof.

135.   In its FY 2017 Form 10-K, filed March 16, 2018, the Company included a substantially similar Note 3, but the fact that ASV now accounted for **_97%_** of SAExploration's reported accounts receivable:

> **At December 31, 2017, the Corporation's largest accounts receivable from one customer was $78.1 million, representing 93% of total consolidated accounts receivable**. … Due to changed economic and political circumstances in the State of Alaska, however, **substantial uncertainty regarding the timing of payments** from the State of Alaska has developed… As a result, as of December 31, 2017, **the Corporation classified the entire receivable from the customer as a long-term accounts receivable** totaling $78.1 million, including an additional $42.1 million reclassification to long-term accounts receivable during the quarter ended December 31, 2017….

136.   This statement was incomplete and materially misleading, and omitted key facts necessary to render it not misleading, because (a) it failed to disclose the name of the "customer" to be ASV; (b) it omitted that ASV was actually controlled and operated for the benefit of SAExploration, and therefore was required by U.S. GAAP to be consolidated as a VIE; (c) it represented that this $78.1 million recorded on its books was a genuine receivable on which it expected to receive payment, when in fact, it knew that ASV had no present ability to pay such amount, knew ASV had no assets sufficient to secure payment in the event that ASV was unable to monetize its Alaska Exploration Credits,  and had no reasonable basis to believe it would ever receive payment; (d) it represented that there was "uncertainty" only as to the **_timing_** of payment of the receivables it recorded, when it knew at that time that it was unlikely ever to collect the entire balance or even the majority thereof; and (e) it classified these accounts as "long-term

accounts receivable" amounts it had no reasonable basis to believe would be collected more than 12 months in the future, or ever.

137.    SAExploration's FY 2017 10-K included substantially identical statements and omissions concerning "Significant Accounting Policies," including "Principles of Consolidation" and "Significant Risks and Uncertainties," "Accounts Receivable and Allowance for Doubtful Accounts," "Revenue Recognition" and "Variable-Interest Entities" to those appearing in its FY 2016 10-K, which statements remained incomplete and materially misleading for the same reasons stated above.

138.    In its original FY 2018 Form 10-K, filed March 25, 2019, SAExploration for the first time issued a risk disclosure (rather than a note to its financial statements) concerning ASV and the Alaska Exploration Credits program:

> ***We face several risks regarding the collection of our largest accounts receivable and our related monetization efforts under Alaska's exploration tax credits (the "Tax Credits") program.***
>
> As of December 31, 2018, ***we have a $52.8 million accounts receivable, net of allowance for doubtful accounts of $19.0 million from one customer. This is our single largest accounts receivable, constitutes the majority of our outstanding accounts receivable and is the largest single asset on our consolidated balance sheet as of December 31, 2018***. We have classified this receivable as long–term because of the length of time we expect it will take to collect on it.
>
> ***In 2018, our customer was successful in licensing and selling the seismic data and we received $3.6 million; however, at this time, we believe that it is unlikely that the customer will be able to fully satisfy the receivable directly***. … [*i*]*n an effort to satisfy the accounts receivable, our customer originally assigned to us $89.0 million of Tax Credit certificates and applications. As of December 31, 2018, we have monetized approximately $17.6 million of Tax Credit certificates and have an estimated $62.3 million of Tax Credit certificates and applications remaining for future monetization, net of actual and estimated audit adjustments related to issued and anticipated Tax Credit certificates*.
>
> In February 2018, we were advised by Alaska that, ***so long as only the statutorily established minimum amount is paid each year, we will not receive any***

*payments until fiscal year 2021 and should not expect to be paid in full until fiscal year 2024…*

In June 2018…*we recorded a $19.0 million provision for doubtful accounts…*

*… While we believe that we will get paid some amount of the Tax Credits, we cannot assure you when that will occur or how much*. …

139.    This risk disclosure was incomplete and materially misleading in that it failed to disclose that ASV was a VIE controlled by Hastings and Whiteley and of which SAExploration was the principal beneficiary. The risk disclosure described a risk to collectability of accounts receivable which, pursuant to U.S. GAAP, should never have been accrued. SAExploration recorded an allowance for doubtful accounts of $19.0 million, when in fact the Company had no reasonable basis to believe that such accounts receivable would even be collectable. SAExploration's risk disclosure in actuality served to conceal and obfuscate the actual facts relating to the Company's risk exposure relating to those credits. It was further misleading in that it concealed that those credits—which were then known to have little chance of ever being monetized—were the only actual assets SAExploration should have reported, and applying U.S. GAAP, would have been recorded at an impaired value far below that of the accounts receivable that SAExploration reported. Furthermore, this putative risk disclosure concealed the risk of investigation and/or prosecution by the Alaska Department of Revenue and other authorities related to the Company's fraudulent claims and collections of Alaska Exploration Credits through ASV.

140.    In actuality, ASV's sole assets consisted of $5.9 million in capital contributions erroneously recorded as transfer fees in SAE's contemporaneous financial statements, together with a seismic data library accumulated through the previously-reported sham transactions with SAExploration, and investments in Alaska Exploration Credits. ASV's Exploration Credits, in

turn, were a highly speculative asset which presented significant risk—risk which grew progressively more apparent as the Class Period progressed.

### 3. Material Misstatements in SAExploration's Results of Operations, Including Revenue, Operating Income (Loss), Net Income (Loss), Earnings-per Share; Working Capital, and Stockholder's Equity (Deficit)

141. The Class Period starts on March 15, 2016, when Defendants filed the Company's fiscal year 2015 Form 10-K (the "2015 10-K"), assuring investors that "as of December 31, 2015, our disclosure controls and procedures were effective, in all material respects."

142. In fiscal year ("FY") 2015, SAExploration reported $228.1 million in revenues. For FY 2016-2018, they reported revenues of $205.6 million, $127 million, and $94.6 million, respectively. For fiscal years 2015-2018, SAExploration reported net losses from operations of approximately $9.9 million, $25 million, $40.8 million, and $82.7 million, and adjusted[7] diluted earnings-per-share ("EPS") of (negative)($12.60), ($122.60), ($86.90), and ($102.25).

143. In actuality, the Company's revenues, assets, and stockholder's equity were materially overstated, and its operating losses, net losses, and basic and undiluted loss per share were materially understated at all relevant times.

144. The Company's amended Form 10-K for FY 2018, filed on February 7, 2020, included a table of selected financial data as restated from the previous years, as follows:

---

[7] The Company issued a 20:1 reverse stock split, effective September 17, 2018. The preceding EPS figures reported here are retroactively adjusted for that split.

| | Year Ended December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2018** | | **2017** | | **2016** | | **2015** | | **2014** [(2)] |
| | (Restated) | | (Restated) | | (Restated) | | (Restated) | | (Restated) |
| **Consolidated Statement of Operations Data:** | | | | | | | | | |
| Revenue from services | $ | 98,670 | $ | 127,022 | $ | 161,615 | $ | 171,344 | $ | 386,820 |
| Operating (loss) income [(1)] | | (43,731) | | (3,971) | | (20,341) | | (11,902) | | 16,667 |
| Net loss | | (59,560) | | (39,656) | | (55,416) | | (32,936) | | (38,917) |
| Net loss available to common stockholders | | (113,465) | | (41,628) | | (58,437) | | (31,468) | | (41,275) |
| Basic and diluted loss per share | $ | (32.91) | $ | (88.76) | $ | (9,070) | $ | (5,388) | $ | (7,583) |
| | | | | | | | | | |
| **Consolidated Balance Sheet Data (at end of period):** | | | | | | | | | |
| Working capital (deficit) | $ | 4,776 | $ | (6,298) | $ | (2,919) | $ | (8,822) | $ | 31,925 |
| Total assets | | 102,347 | | 81,263 | | 126,360 | | 130,830 | | 191,453 |
| Long-term debt, net | | 83,205 | | 114,946 | | 91,444 | | 135,685 | | 144,163 |
| Total stockholders' deficit | | (17,364) | | (56,061) | | (16,939) | | (51,805) | | (29,081) |

___

(1)   Includes approximately $1.1 million, $0.5 million, $0.4 million, $0.5 million and $0.2 million misappropriated by our former Chief Financial Officer and General Counsel in 2018, 2017, 2016, 2015 and 2014, respectively, and approximately $5.2 million and $6.8 million misappropriated by our former Chief Executive Officer and former Chief Financial Officer and General Counsel to Global Equipment in 2016 and 2015, respectively.  See "Explanatory Note" and "Note 3. Restatement of Previously Reported Consolidated Financial Statements" and "Note 24. Quarterly Data" to our consolidated financial statements in "Item 8. Financial Statements and Supplementary Data," both contained herein.

(2)   Includes $0.5 million misappropriated by our former Chief Executive Officer in 2013 that was previously recorded in income tax expense in 2014.  See "Explanatory Note" and "Note 3. Restatement of Previously Reported Consolidated Financial Statements" to our consolidated financial statements in "Item 8. Financial Statements and Supplementary Data," both contained herein.

145.   The Company's original Form 10-K for FY 2018, filed on March 25, 2018, included no similar table, but the reported numbers can be extracted from the historical Forms 10-K filed in FY 2018, 2017, 2016, 2015, and 2014 (all in thousands, except per-share amounts):

| | **2018** | **2017** | **2016** | **2015** | **2014** |
|---|---|---|---|---|---|
| **Consolidated Statement of Operations Data:** | | | | | |
| **Revenue from Services** | $94,604 | $127,022 | $205,564 | $228,137 | $386,820 |
| | | | | | |
| **Operating (loss) income** | ($62,505) | ($3,528) | $11,241 | $15,589 | $16,667 |
| **Net loss** [8] | ($82,695) | ($38,784) | ($22,009) | ($5,442) | ($38,395) |
| **Net loss available to common stockholders** | ($83,600) | ($40,756) | ($25,030) | ($9,875) | ($41,753) |
| | | | | | |
| **Basic and Diluted Loss per Share** [9] | ($102.25) | ($86.90) | ($122.60) | ($1,691) | ($7,668) |
| | | | | | |
| **Consolidated Balance Sheet Data (at end of period)** | | | | | |
| **Working Capital (deficit)** [10] | $2,785 | ($2,960) | $40,807 | $36,876 | $31,859 |
| **Total assets** | $137,473 | $141,938 | $201,665 | $154,424 | $203,793 |

___

[8] Net loss attributable to shareholders is reported as net loss attributable to the corporation in historical financial statements.
[9] There was a 20:1 reverse split in September 2018 and a 135:1 reverse split in July 2016. Figures for 2014-2016 have been adjusted to account.
[10] Working Capital is not presented in SAExploration's annual reports prior to the February 7, 2020 Restatement. Working Capital here is calculated by subtracting total Current Assets from total Current Liabilities.

| | | | | | |
|---|---|---|---|---|---|
| **Long-term debt, net** [11] | $78,461 | $116,685 | $100,602 | $124,440 | $143,594 |
| **Total stockholders' equity (deficit)** | $15,373 | (189) | $38,061 | ($30,212) | ($32,439) |

146.     This presentation brings into sharp relief the profound effect that SAExploration's false and misleading financial reporting had on its metrics of financial performance. Revenue was overstated by $56.8 million (approximately 33.1%) in 2015 and by $43.9 million (27.2%) in 2016.  The Company transformed operating *losses* of $11.9 million and $20.3 million respectively, into operating *income* of $15.6 million and $11.2 million, respectively. Net losses in those periods were *six times* what SAExploration reported for 2015 and *2.5 times* what they reported for 2016. The Company original reported a loss per share for 2016 of only *$122.60*. The actual loss for each share in that period was *$9,070*, an increase of *7398%*.

147.     These misstatements would be deemed material by any reasonable investor in assessing the value of SAExploration's securities and its expected future earnings, and misstatements of this magnitude would be expected to—and did—artificially inflate the price of SAExploration's securities during the class period.

148.     The Company's Form 10-Q and 10-K filings for each quarter of 2018, filed May 15, 2018 (Q1 2018 10-Q), August 9, 2018 (Q2 2018 10-Q), November 13, 2018 (Q3 2018 10-Q), and March 25, 2019 (2018 10-K), reported the Company's financial figures as follows (all in thousands, except per-share amounts):

| | Q1 2018 | Q2 2018 | Q3 2018 | Q4 2018 |
|---|---|---|---|---|
| **Consolidated Statement of Operations Data:** | | | | |
| **Revenue from Services** | $37,123 | $16,883 | $15,003 | $25,595 |
| **Operating (loss) income** | $2,320 | ($30,885) | ($18,891) | ($15,049) |
| **Net loss** | ($1,474) | ($33,346) | ($25,297) | ($22,578) |

---

[11]  Again, "Long term debt, net" is not presented in the Company's historical financial statements. It is here calculated by subtracting short-term debt from total debt, then subtracting cash-on-hand.

| | | | | |
|---|---|---|---|---|
| **Basic and Diluted Loss per Share** | ($92.06) | ($44.90) | ($27.80) | ($7.75) |
| | | | | |
| **Consolidated Balance Sheet Data (at end of period)** | | | | |
| **Working Capital (deficit)** [12] | $10,306 | $1,992 | $14,055 | -- |
| **Total assets** | $159,952 | $121,184 | $154,435 | -- |
| **Long-term debt, net** | $57,360 | $57,425 | $87,349 | -- |
| **Total stockholders' equity (deficit)** | $40,964 | $10,204 | $37,642 | -- |

149. The foregoing representations differed remarkably from the reality. Investors were misled as the fiscal standing of the Company, as well as the value of investor holdings, were materially misreported. Notably, stockholder equity was consistently overstated throughout 2018, going from over $40 million in Q1 to *negative $13.8 million* in the restatement, from over $10 million in Q2 to *negative $29.08 million*, and from $37.6 million in Q3 to just over $1 million. The Company's total assets were also materially overstated by *thirty-seven percent* in Q1, *thirty-one percent* in Q2, and *twenty-five percent* in Q3.

150. The Company's Form 10-Q and 10-K filings for each quarter of 2017, filed May 5, 2017 (Q1 2017 10-Q), August 21, 2017 (Q2 2017 10-Q), November 8, 2017 (Q3 2017 10-Q), March 16, 2018 (2017 10-K), reported the Company's financial figures as follows (all in thousands, except per-share amounts):

| | Q1 2017 | Q2 2017 | Q3 2017 | Q4 2017 |
|---|---|---|---|---|
| **Consolidated Statement of Operations Data:** | | | | |
| **Revenue from Services** | $86,169 | $13,559 | $22,452 | $4,842 |
| | | | | |
| **Operating (loss) income** | $18,627 | ($7,375) | ($4,534) | ($10,246) |
| **Net loss** | ($8,827) | ($17,840) | ($13,845) | ($15,926) |

---

[12] Working Capital is calculated here by subtracting total Current Assets from total Current Liabilities for the relevant period.

| | | | |
|---|---|---|---|
| **Basic Earning (loss) per Common Share** | $14.63 | ($38.26) | ($29.30) | ($33.81) |
| **Diluted Earnings (loss) per Common Share** | $14.56 | ($38.26) | ($29.30) | ($33.81) |
| **Consolidated Balance Sheet Data (at end of period)** | | | | |
| **Working Capital (deficit)** | $44,758 | $26,741 | $14,739 | -- |
| **Total assets** | $217,123 | $172,875 | $158,621 | -- |
| **Long-term debt, net** | $84,267 | $86,528 | $86,902 | -- |
| **Total stockholders' equity (deficit)** | $47,452 | $29,950 | $15,287 | -- |

151.     The above misrepresentations once again demonstrate the significant impact that SAExploration's false and misleading financial reporting had on its metrics of financial performance. For the first three quarters of 2017, Defendants overstated the Company's current assets by ***forty-two percent*** in Q1, ***fifty-three percent*** in Q2, and ***fifty-seven percent*** in Q3. The Company's total assets were also materially overstated by ***thirty-two percent*** in Q1, over ***thirty-seven percent*** in Q2, and ***thirty-nine percent*** in Q3. The restatement also revealed that stockholders' equity had been wiped out entirely while Defendants had been regularly presenting positive reports of stockholders' equity. Instead, stockholders' equity was represented as being worth over $47 million in Q1, when, in actuality, it was really ***negative $7.8 million***. In Q2, Defendants reported $29 million in stockholders' equity, when the real figure was ***negative $25.5 million***, and reported $15.2 million in Q3 when the real figure was over ***negative $40 million*** – a misrepresentation of about ***360%***.

### 4. Misstatements Emphasizing Growth and the Importance of North American and Alaska Operations to SAE's Overall Results

152.     The following statements made by Defendants emphasized the financial growth and prospects of the Company, as well as the importance of North American and Alaska operations to SAE's overall results, and thus bolsters the materiality of any misrepresentations or omissions involving those sectors.

153.    During the Company's August 6, 2015 earnings conference call to discuss SAE's second quarter 2015 financial results, in which Hastings, Beatty, and Whiteley each participated, Hastings commented as follows:

> *While our revenue was down compared to last year, we produced considerably stronger levels of cash flow and earnings.*

154.    In the same call, Beatty discussed SAE's purported activity and opportunities during the current quarter:

> *In North America we have benefited greatly from the very strong and active Alaska market thanks to the high barriers to entry we've established in prior years which has led to a strong position because of our competitive advantages.*

155.    Whiteley then discussed about SAE's financial results for the first quarter and first half of 2015:

> *[…] Alaska and ocean-bottom marine experienced significant growth during the first two quarters of 2015.*
>
> *By geography approximately $40 million or about 60% of our revenues for the second quarter were generated in North America… North America generated approximately $101.5 million or 69% of revenues* ...

156.    On November 5, 2015, the Company hosted an earnings conference call with various securities analysts to discuss SAE's third quarter 2015 financial results. Abney, Hastings, Beatty, and Whiteley each participated in this conference call. Whiteley discussed the Company's financial results for the quarter, stating:

> Total revenues for Q3 decreased by $57.9 million or about 46.3% from $107.8 million in the third quarter of 2014. Revenues for the first nine months 2015 decreased 31.5% to $204.5 million from $298.6 million in the same period last year. The decrease in revenue was primarily the result of reduced exploration activity in South America, along with little to no activity in Canada. *However, Alaska and ocean-bottom marine experienced significant growth during the first three quarters of 2015.*
>
> *By geography, approximately $56.3 million or 97% of our revenues for the third quarter were generated in North America*...

157.    On March 9, 2016, the Company issued a press release entitled, "SAExploration Announces Fourth Quarter and Fiscal Year 2015 Consolidated Financial Results." This press release stated in pertinent part:

> [G]ross profit as a percentage of revenue, excluding depreciation expense, increased substantially from Q4 2014, mostly due to improved operational execution and higher crew efficiencies generated at the field level.
>
> […]
>
> Revenues decreased 41.0% to $228.1 million from $386.8 million in 2014. **Revenue from Alaska and Malaysia increased materially from last year due to a higher number of production-related projects in those regions. Specifically, North American revenue, primarily from Alaska, increased 35.7% from 2014. The improvement in gross profit as a percentage of revenue was primarily related to the improved operational execution in Alaska** and the favorable performance on the Malaysian deep water ocean bottom marine project completed in the second quarter of 2015.

158.    On March 10, 2016, the Company hosted an earnings conference call with various securities analysts to discuss SAE's fourth quarter and year-end 2015 financial results. Abney, Hastings, Beatty, and Whiteley each participated in this conference call. In his remarks, Hastings added:

> This, along with our streamlined asset-light approach, resulted in comparatively stronger levels of operating cash flow and our highest ever adjusted EBITDA. **We attribute much of the success in 2015 to the strength of our performance in the Alaskan market** …. **While overall activity levels remain below historical averages, we continue to experience demand for our services in certain key markets namely those with high leverage to production enhancement initiatives**.

159.    In addition, Whiteley discussed the Company's financial results as follows:

> Total revenues for Q4 decreased to $23.7 million or by 73.2% from $88.2 million in the fourth quarter of 2014. Revenues for the full year of 2015 decreased 41% to $228.1 million from $386.8 million in 2014. **Revenue from Alaska and Southeast Asia increased materially from 2014 due to a higher number of production-enhancement-related projects in those regions.** However, this was offset by a meaningful decrease in exploration activity in South America during the same period.

*By geography, approximately $15.6 million or 66% of our revenues for the fourth quarter were generated in North America …For the full year of 2015, North America generated approximately $173.4 million or about 76% of revenues …*

160.    On March 15, 2016, SAE filed its 2015 year-end financial statements with the SEC on Form 10-K (2015 10-K), which was signed by Hastings, Beatty and Whiteley and repeated the financial information contained in the March 9, 2016 press release and the March 10, 2016 earnings conference call. Additionally, the 2015 10-K stated as follows:

### Revenues by Geographic Region

The following table is a summary of our revenues by the geographic region in which we provided services for the years ended December 31, 2015 and 2014:

| | 2015 | % of Revenue | | 2014 | % of Revenue | | Increase (Decrease) | Percentage Change |
|---|---|---|---|---|---|---|---|---|
| **Revenue from services:** | | | | | | | | |
| **North America** | 173,416 | 76.0 | % | $ 127,804 | 33.0 | % | $ 45,612 | 35.7 % |
| **South America** | 27,252 | 12.0 | % | 258,266 | 66.8 | % | (231,014) | (89.4) % |
| **Southeast Asia** | 27,469 | 12.0 | % | 750 | 0.2 | % | 26,719 | 3,562.5 % |
| **Total revenue** | 228,137 | 100.0 | % | $ 386,820 | 100.0 | % | $ (158,683) | (41.0) % |

*North America:* **The increase in revenue was due principally to increased 2015 revenue in Alaska resulting from an overall greater seismic activity and market share in the North Slope region compared to 2014,** partially offset by significantly reduced revenue in Canada. **The market in the North Slope region of Alaska experienced significant growth during the 2015 winter season as a result of favorable market and regulatory conditions for oil and gas producers**…..

161.    On May 12, 2016, the Company issued a press release relating to the Company's first quarter 2016 financial results, which provided in relevant part:

**First Quarter 2016 Financial Results**
**Revenues increased 13.1% to $90.2 million from $79.7 million in Q1 2015. Revenues increased primarily due to an increase in activity in North America and South America. During Q1 2016, our operations in Alaska experienced an increase in the overall amount of projects performed**

162.    On May 13, 2016, the Company hosted an earnings conference call with various securities analysts to discuss SAE's first quarter 2016 financial results. Abney, Hastings, Beatty,

and Whiteley each participated in this conference call. Beatty stated:

> *In North America, we were more active this past winter season than the last year. In Alaska, we performed more projects overall, with a healthy mix of North Slope and Cook Inlet programs.*

163.    In addition, Whiteley discussed the Company's financial results as follows:

> *Total revenues increased approximately 13% to $90.2 million from $79.7 million in the first quarter of 2015. The increase in revenue was primarily the result of an increase in activity in North America and South America. During Q1 2016, our operations in Alaska experienced an increase in the overall amount of projects performed…*,

164.    On May 16, 2016, SAE filed its first quarter financial statements with the SEC on Form 10-Q (Q1 2016 10-Q), which was signed by Beatty and Whiteley and provided in relevant part:

> *…Revenue in North America for the three months ended March 31, 2016 increased by $ 4,139 or 6.7% compared to the three months ended March 31, 2015, primarily in Alaska and Canada. …. The increase in activity was due, in part, to certain customers' desire to complete programs that would qualify under certain Tax Credit incentives …*
> […]

165.    On March 15, 2017, the Company issued a press release entitled, "SAExploration Announces Fourth Quarter and Fiscal Year 2016 Consolidated Financial Results," which stated in pertinent part:

> **Fiscal Year 2016 Financial Results**
> *Revenues decreased 9.9% to $205.6 million from $228.1 million in 2015. Revenues in 2016 decreased significantly in Alaska and Southeast Asia due to a decrease in active projects in these regions compared to the prior period. …*

166.    On March 17, 2017, SAE filed its 2016 year-end financial statements with the SEC on Form 10-K ("2016 10-K"), which was signed by Hastings, Beatty and Whiteley and repeated the financial information contained in the March 15, 2017 press release and the March 13, 2017 earnings conference call. Additionally, the 2016 10-K stated as follows:

**Customers**

…. *During the year ended December 31, 2016, we had three customers, Alaskan Seismic Ventures, BG Bolivia Corporation, and Hocol Petroleum Limited, that individually exceeded 10% of our consolidated revenue and represented 74% of consolidated revenue for the period. During the year ended December 31, 2015, we had four customers, Alaskan Seismic Ventures, Repsol, Prosper Energy Systems Group Sdn Bhd (Malaysia), and BP Exploration, that individually exceeded 10% of our consolidated revenue and represented 77% of our consolidated revenue for the period.*

**Equipment Purchases and Capital Expenditures**

During 2016, we made minimal capital expenditures of approximately $3.4 million, primarily related to the purchase of a set of vibrators. During 2015, we made capital expenditures of approximately $6.4 million, which included purchases of non-seismic recording equipment necessary to outfit a second crew on the North Slope in Alaska and to acquire other seismic acquisition and logistics equipment.

167.    On March 15, 2018, the Company issued a press release entitled, "SAExploration Announces Fourth Quarter and Fiscal Year 2017 Consolidated Financial Results," which stated in pertinent part:

**Fourth Quarter 2017 Financial Results**

*Revenues decreased 80.9% to $4.8 million from $25.4 million in Q4 2016, primarily due to a decrease in revenue from Colombia and Alaska, partially offset by a year-over-year increase in revenue in Canada.* Activity levels in all jurisdictions continue to be impacted by poor market conditions ….

**Fiscal Year 2017 Financial Results**

*Revenues decreased 38.2% to $127.0 million from $205.6 million in 2016. Revenues decreased significantly in North and South America due to a decrease in active projects*.

168.    On March 25, 2019, SAE's 2018 year-end financial statements on Form 10-K ("2018 10-K"), which was signed by Hastings, Beatty and Whiteley, stated in part:

**Results of Operations**

*Net loss for 2018 was $82.7 million compared with $38.8 million for 2017.* The significant factors in this change were an increase of $34.4 million in selling, general and administrative ("SG&A") expenses and decreases of $24.6 million in

gross (loss) profit, $13.2 million in other expense, net and $1.9 million in income taxes.

*Revenue from services for 2018 decreased $32.4 million compared with 2017. In North America, revenue from services increased*

*$11.1 million due to an increase in the number of projects performed in Canada and the Lower 48 offset by a decrease in the number of projects in Alaska.* ….

[…]

169.    On March 25, 2019, the Company issued a press release entitled, "SAExploration Announces Fourth Quarter and Fiscal Year 2018 Consolidated Financial Results," which stated in pertinent part:

**Fourth Quarter 2018 Results**

*SAE reported revenues of $25.6 million for the fourth quarter of 2018, a 70.6% increase from the third quarter of 2018 and a 428.6% increase from the fourth quarter of 2017. The increase from both the third quarter of 2018 and the fourth quarter of 2017 was due to an increase in the number of projects in North America offset by fewer projects in Colombia.*

**Fiscal Year 2018 Results**

*SAE reported revenues of $94.6 million for 2018, a 25.5% decrease from 2017. The decrease from 2017 was due to fewer projects in South America, primarily Colombia, and no projects in West Africa, partially offset by more projects in North America, primarily in Canada and the Lower 48.*

*As of December 31, 2018, SAE's backlog was $184.9 million, which does not include the recently announced $60.0 million of new projects in Alaska and the Asia Pacific region.* ….

170.    The statements referenced in Paragraphs 106-169 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (a) SAExploration's revenues were materially false and misleading, in that they reported fictitious revenues from transactions with

ASV, an undeclared VIE, which should have been consolidated in its financial statements in accordance with U.S. GAAP, and mischaracterized and misclassified funds diverted by members of senior management as legitimate business expenses; (b) SAExploration's financial statements violated Generally Accepted Accounting Principles ("GAAP") by failing to report ASV as a variable-interest entity; (c) the Company had a controlling financial interest in ASV, which required the Company to consolidate ASV in its financial statements; (d) SAE did not maintain, implement, or enforce adequate internal controls over financial reporting or Company assets; (e) SAE did not maintain, implement, or enforce adequate accounting controls to ensure the accuracy of SAE's books and records, including the fact that certain transactions were funneled to companies owned and controlled by members of the Company's senior management, and its financial statements therefore failed to comply with GAAP; (f) the aforementioned practices were likely to lead to an investigation of the Company by the SEC, DOJ, and/or the Alaska Department of Revenue; and (g) as a result, Defendants' statements about SAExploration's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

171.    As a result of the improper practices set forth above, SAExploration's financial results were materially overstated and needed subsequently to be restated. Moreover, the statements that discussed the manner and reasons for the Company's achievement of its sales, revenue, net income, as well as growth and future prospects, contained material omissions in that Defendants failed to disclose the true circumstances underlying these financial results.

### 5.  Misstatements in Reporting Material Related Party Transactions

1.    Related party transactions must be disclosed under SEC regulations and GAAP. This is because a related party's influence might result in transaction terms that either differ from

terms negotiated between independent parties, or transactions that would not have otherwise occurred.  Another rationale for disclosing related party transactions to investors is that these types of transactions could be structured to achieve specific accounting results that are inconsistent with their substance.  In addition, such financial relationships might create a significant incentive or pressure to perpetrate fraudulent financial reporting or create an opportunity for self-dealing or unjust enrichment.

2.       Accordingly, Item 404 required Defendants to describe, in SAE's financial statements filed with the SEC during the Class Period, "any transaction, since the beginning of the registrant's last fiscal year, in which the registrant was or is to be a participant and the amount involved exceeds $120,000, and in which any related person had or will have a direct or indirect material interest."  17 C.F.R. § 229.404(a).

3.       For purposes of Item 404, a "related person" is defined by Regulation S-K as including any director or executive officer of the Company, any nominee for director, or any immediate family member of a director or executive officer of the registrant, or of any nominee for director or any 5% or greater shareholder.

4.       In addition to the disclosure requirements under Item 404, Regulation S-X 4-08(k)(1) required Defendants to disclose the amounts of related party transactions on the face of the balance sheet, statement of comprehensive income, or statement of cash flows.  17 C.F.R. § 210.4-08.

5.       GAAP also required disclosure of related party transactions.  Per ASC 850-10-50-1 (formerly FAS No. 57), SAE's financial statements filed with the SEC during the Class Period should have included disclosures of material related party transactions. Under GAAP, the disclosures should have included, *inter alia*:

a.  The nature of the relationship(s) involved;

b.  A description of the transactions, including transactions to which no amounts or nominal amounts were ascribed for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements;

c.  The dollar amounts of the transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period;

d.  Amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. Notes or accounts receivable from officers, employees, or affiliated entities must be shown separately and not included under a general heading such as notes receivable or accounts receivable.

6.      GAAP requires these disclosures because "[t]ransactions involving related parties cannot be presumed to be carried out on an arm's-length basis, as the requisite conditions of competitive, free-market dealings may not exist."  ASC 850-10-50-5.

7.      Despite these mandated disclosure requirements, Defendants concealed related party transactions from investors.

8.      Specifically, Defendants concealed from investors that SAE hired and paid hundreds of thousands of dollars to companies operated by Defendants Hastings and Whiteley, directly or through members of their immediate family. Several of SAE's contractors and consultants from whom it leased equipment and purchased goods and services during the Class Period were owned or controlled by Defendants Hastings, Beatty, and Whiteley.

172.     Given that the above-described transactions directly benefitted Defendants Hastings and Whiteley and/or member of their immediate family, these transactions cannot be presumed to have been carried out on an arm's-length basis.  The transactions should have been disclosed to investors in SAE's financial statements as related party transactions.

173.     Moreover, Defendants Hastings and Whiteley—who had a personal incentive to conceal transactions involving businesses they controlled—were in fact *charged with reviewing and reporting the related party transactions* in their roles as CEO and CFO, respectively.

174.     Clearly SAE's Board of Directors, including Defendant Hastings as Chairman and Defendants Beatty, Sgro, Monahan, Dalton, Cooper, and Faust, were not in position to neutrally and fairly evaluate conflicts of interest—and disclose as required—related party transactions especially those involving businesses owned and controlled by the Chairman of the Board. Still Defendants misled investors about known conflicts of interest and related party transactions. In an April 29, 2016 amendment to SAE's 2015 10-K filed on Form 10-K/A, as well as in an April 27, 2018 Proxy Statement pursuant to Section 14(a) of the Exchange Act, Defendants stated as follows:

> **ITEM 13.** *Certain Relationships and Related Transactions, and Director Independence.*
>
> **Related Person Policy**
>
> Our Code of Ethics requires us to avoid, wherever possible, all related party transactions that could result in actual or potential conflicts of interests, except under guidelines approved by our Board of Directors or the Audit Committee. Related-party transactions are defined as transactions in which (i) the aggregate amount involved will or may be expected to exceed $120,000 in any calendar year, (ii) we or any of our subsidiaries are a participant, and (iii) any (a) executive officer, director or nominee for election as a director, (b) greater than five percent beneficial owner of shares of our common stock, or (c) immediate family member of any of the persons referred to in clauses (a) and (b), has or will have a direct or indirect material interest (other than solely as a result of being a director or a less than 10% beneficial owner of another entity). A conflict of interest situation can arise when a person takes actions or has interests that may make it difficult to

perform his or her work objectively and effectively. Conflicts of interest may also arise if a person, or a member of his or her family, receives improper personal benefits as a result of his or her position.

***All ongoing and future transactions between us and any of our officers and directors or their respective affiliates, including loans by our officers and directors, will be on terms we believe to be no less favorable to us than are available from unaffiliated third parties***. Such transactions or loans, including any forgiveness of loans, will require prior approval by a majority of our disinterested "independent" directors or the members of our Board who do not have an interest in the transaction, in either case who had access, at our expense, to our attorneys or independent legal counsel. We will not enter into any such transaction unless our disinterested "independent" directors determine that the terms of such transaction are no less favorable to us than those that would be available to us with respect to such a transaction from unaffiliated third parties.

Our Audit Committee, which is comprised of disinterested "independent" directors, pursuant to its written charter, is responsible for reviewing and approving related party transactions to the extent we enter into such transactions. ***The Audit Committee will consider all relevant factors when determining whether to approve a related party transaction, including the extent of the related party's interest in the transaction***. No director may participate in the approval of any transaction in which he is a related party, but that director is required to provide the Audit Committee with all material information concerning the transaction. Additionally, we require each of our directors and executive officers to complete an annual directors' and officers' questionnaire that elicits information about related party transactions.

These procedures are intended to determine whether any such related party transaction impairs the independence of a director or presents a conflict of interest on the part of a director, employee or officer.

Emphasis added.

175.    The statements referenced above were materially false and/or misleading because they misrepresented and failed to disclose that (1) Defendants did not adhere to their own Code of Ethics policy, or in the alternative, the Code of Ethics was woefully inadequate in preventing the fraudulent transactions and dealings detailed herein; (2) between 2016 and 2019, Hastings, Whiteley, and Beatty executed several loan and guarantee agreements which were filed with the SEC, without disclosing that the entity at issue (NES, LLC) was owned by, and acquired from Hastings; and (3) as a result, both actual and potential conflicts of interests existed, yet were

undisclosed by Defendants.

176.    In addition, Defendants misleadingly reported certain related party transactions

while omitting others. For instance, the Company's 2015 10-K stated as follows:

**NOTE 17 — RELATED PARTY TRANSACTIONS**
The following related party transactions occurred during the years ended December 31, 2015 and 2014 and are primarily related to the Merger transaction which closed on June 24, 2013 or events prior to the Merger. All positions and directorships referenced below are with the Corporation unless otherwise indicated.

In connection with the Merger, the outstanding Series A Convertible Preferred Stock of Former SAE (the "Preferred Shares") owned by CLCH, LLC ("CLCH"), which is controlled by Jeff Hastings, Executive Chairman of the Board and Director, was redeemed for $5,000 and retired. Cumulative dividends on the Preferred Shares in the amount of $1,072 were accrued in 2013 and paid to CLCH on July 2, 2014.

In connection with the Merger, the Corporation issued a promissory note in the principal amount of $17,500 to CLCH, as a representative of the Former SAE common stockholders, as Merger consideration to the Former SAE common stockholders as discussed further in Note 6. The promissory note was repaid with interest on July 2, 2014, at which time principal and interest in the amount of $9,873, $3,581, $853, $127 and $93 was received by CLCH; Seismic Management, LLP ("Seismic"), which is controlled by Brian A. Beatty, Chief Executive Officer, President and Director; Brent Whiteley, Chief Financial Officer, General Counsel and Secretary and a Director; Mike Scott, Executive Vice President-Operations, and Darrin Silvernagle, Executive Vice President-Marine, respectively.

9.    The Company's 2016 10-K stated as follows:

**NOTE 19 — RELATED PARTY TRANSACTIONS**

Jeff Hastings, the Corporation's Chief Executive Officer and Chairman of the Board of Directors, owns and controls Speculative Seismic Investments, LLC ("SSI"), which as of March 10, 2017, holds 109,156 shares of the Corporation's common stock. SSI is a lender under the Corporation's Senior Loan Facility in the principal amount of $543 and exchanged $2,352 of the Corporation's Existing Notes for $1,334 of Second Lien Notes in the Restructuring consummated on July 27, 2016. SSI subsequently sold the $1,334 of Second Lien Notes in November 2016 representing $1,176 of face value and $158 of interest paid in kind for the period outstanding and is no longer a holder of any Second Lien Notes. Mr. Hastings also controls CLCH, LLC, which holds 24,221 shares of the

Corporation's common stock. Pursuant to a registration rights agreement dated June 24, 2013, CLCH had one right to demand registration of its shares of our common stock that it acquired in the Merger, as well as piggy-back rights on any offering of our common stock or securities exercisable or exchangeable for our common stock. CLCH has exercised its piggy-back registration rights, and all 24,221 of its shares were registered for resale pursuant to a registration statement on Form S-3, Registration No. 333-213386, that became effective mid-September 2016. The Corporation bore the expense incurred in connection with the registration statement.

10.     The Company's 2017 10-K stated as follows:

**NOTE 19 — RELATED PARTY TRANSACTIONS**

Jeff Hastings, the Corporation's Chief Executive Officer and Chairman of the Board of Directors, beneficially owns and controls Speculative Seismic Investments, LLC ("SSI"), which as of December 31, 2017, holds 27,000 shares of the Corporation's common stock. SSI is a lender under the Corporation's Senior Loan Facility in the principal amount of $543 and exchanged $2,352 of the Corporation's Senior Secured Notes for $1,334 of Second Lien Notes in the 2016 Restructuring consummated on July 27, 2016. SSI subsequently sold $1,334 of Second Lien Notes in November 2016 representing $1,176 of face value and $158 of interest paid in kind for the period outstanding and is no longer a holder of any Second Lien Notes. In addition, in September 2017, Mr. Hastings committed to funding $400 of the Credit Facility, which was subsequently reduced to $375 as of December 21, 2017. The Corporation has drawn $125 of that commitment as of December 31, 2017.

Mr. Hastings also controls CLCH, LLC, which holds 24,221 shares of the Corporation's common stock. Pursuant to a registration rights agreement dated June 24, 2013, CLCH had one right to demand registration of its shares of our common stock that it acquired in the Merger, as well as piggy-back rights on any offering of our common stock or securities exercisable or exchangeable for our common stock. CLCH has exercised its piggy-back registration rights, and all 24,221 of its shares were registered for resale pursuant to a registration statement on Form S-3, Registration No. 333-213386, that became effective mid-September 2016. The Corporation bore the expense incurred in connection with the registration statement.

11.     The Company's 2018 10-K stated as follows:

**NOTE 19. RELATED PARTY TRANSACTIONS**

Mr. Hastings, our Chief Executive Officer and Chairman of the Board of Directors, owns and controls Speculative Seismic Investments, LLC ("SSI"), which holds 1,350 shares of our common stock, and controls CLCH, LLC, which holds 1,201 shares of our common stock.

As of December 31, 2018, SSI is a lender under our senior loan facility in the principal amount of $0.6 million. Mr. Hastings is also a lender under our credit facility in the principal amount of $0.8 million and was an initial purchaser of our 2023 Notes in the principal amount of $1.0 million.

12.    The statements referenced above were materially false and/or misleading because they misrepresented and failed to disclose multiple related party transactions, in which Defendants were actively involved in or which were known to Defendants or recklessly disregarded by them, including: (1) the over $10 million of fraudulent transactions comprising the fraud and embezzlement carried out by Hastings and Whiteley; (2) each of the transactions involving ASV, an entity ultimately controlled by Mr. Whiteley, including the $5.9 million that was transferred as a capital contribution to ASV; and (3) the misappropriation of millions of dollars of funds that were presumably converted to Hastings and/or Whiteley's personal use. In addition, Defendants' reporting of some related party transactions while omitting others implied they were not aware of other related party transactions., and thus falsely represented Defendants' business, operations and prospects to investors.

### 6.  Misstatements Regarding Internal Controls

177.    In each filing with the SEC, SAE issued statements regarding the effectiveness of its internal controls over financial reporting, generally stating that its internal controls were effective. The following is the relevant language included, in substantive part, in SAE's SEC filings regarding its internal controls on August 7, 2015, November 5, 2015, May 16, 2016, August 12, 2016, November 4, 2016, May 5, 2017, August 21, 2017, November 8, 2017, March 16, 2018 May 15, 2018, August 9, 2018, November 13, 2018, May 14, 2019[13]:

---

[13] The date and type of report (Form 10-Q or Form 10-K) reflected the period set forth in the relevant SEC filing in which the statements were made.

**ITEM 4. CONTROLS AND PROCEDURES**
**Management's Evaluation of Disclosure Controls and Procedures.**

We carried out an evaluation, under the supervision and with the participation of our management, including our principal executive and principal financial officers, of the effectiveness of our disclosure controls and procedures pursuant to Rule 13a-15(e) and 15d-15(e) under the Exchange Act as of the end of the period covered by this report. Based upon that evaluation, our Chief Executive Officer and our Chief Financial Officer concluded that, as of June 30, 2015, our disclosure controls and procedures were effective, in all material respects, with regard to the recording, processing, summarizing and reporting, within the time periods specified in the SEC's rules and forms for information required to be disclosed by us in the reports that we file or submit under the Exchange Act. Our disclosure controls and procedures include controls and procedures designed to ensure that information required to be disclosed in reports filed or submitted under the Exchange Act is accumulated and communicated to our management, including our President and Chief Executive Officer and our Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

**Changes in Internal Control over Financial Reporting**

There were no changes in our internal control over financial reporting that occurred during the second quarter of the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

178.    On March 15, 2016, March 17, 2017, March 16, 2018, March 25, 2019[14]:

**ITEM 9A. CONTROLS AND PROCEDURES**
**Management's Evaluation of Disclosure Controls and Procedures**
We carried out an evaluation, under the supervision and with the participation of our management, including our principal executive and principal financial officers, of the effectiveness of our disclosure controls and procedures pursuant to Rule 13a-15(e) and 15d- 15(e) under the Exchange Act as of the end of the period covered by this report. Based upon that evaluation, our Chief Executive Officer and our Chief Financial Officer concluded that, as of December 31, 2015, our disclosure controls and procedures were effective, in all material respects, with regard to the recording, processing, summarizing and reporting, within the time periods specified in the SEC's rules and forms for information required to be disclosed by us in the reports that we file or submit under the Exchange Act. Our disclosure controls and procedures include controls and procedures designed to ensure that information required to be disclosed in reports filed or submitted under the Exchange Act is accumulated and communicated to our management, including our President and Chief Executive Officer and our Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

---

[14] Each reported date reflected the period set forth in the relevant SEC filing in which the statements were made.

**Management's Annual Report on Internal Control Over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Our internal control over financial reporting was designed by management, under the supervision of the Chief Executive Officer and Chief Financial Officer, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America, and includes those policies and procedures that:

i. pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets;

ii. provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with accounting principles generally accepted in the United States of America, and that our receipts and expenditures are being made only in accordance with authorizations of our management and directors; and

iii. provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on our financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies and procedures may deteriorate.

Management assessed the effectiveness of our internal control over financial reporting as of December 31, 2015. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in *Internal Control-Integrated Framework (2013)*.

Based on our evaluation under the criteria in *Internal Control-Integrated Framework (2013)*, **management has concluded that we maintained effective internal control over financial reporting** as of December 31, 2015.

### Changes in Internal Control over Financial Reporting

There were no changes in our internal control over financial reporting that occurred during the fourth quarter of the period covered by this report that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

179.     The statements identified in ¶¶ 182-190 above were materially false and misleading because, in fact, SAExploration suffered from numerous material weaknesses in the Company's internal controls over financial reporting, which SAExploration essentially admitted to in its 10-K filed with the SEC on February 7, 2020.  As a result of these material weaknesses, Defendants failed to disclose certain accounting errors, financial reporting misstatements, and material related party transactions in SAExploration 's FY 2014-2018 annual Forms 10-K and quarterly forms 10-Q.

180.     The foregoing misstatements were significant because investors and the market generally monitor the quality of a company's internal controls because strong controls reassure investors that a company's financial data is accurate.  Weak internal controls, on the other hand, make a company vulnerable to instances of inaccurate financial reporting or malfeasance, causing the company's public statements regarding the company's operations, financial performance, and prospects to be less reliable.

181.     As a publicly traded company, SAExploration was required by the Exchange Act to maintain books and records in sufficient detail to reflect the transactions of the Company and prepare financial statements in accordance with GAAP. Specifically, the Exchange Act requires that public companies:

182.     make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

183.     devise and maintain a system of internal accounting controls sufficient to provide

reasonable assurances that-

    i.   transactions are executed in accordance with management's general or specific authorization;

    ii.   transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets. (15 USC § 78m(b)(2))

184.    Furthermore, the SEC requires that issuers maintain, and regularly evaluate the effectiveness of, disclosure controls and procedures designed to ensure that the information required in reports under the Exchange Act is recorded, processed, summarized and reported on a timely basis.[23] Also, the Sarbanes-Oxley Act of 2002 ("SOX") requires a Company's independent auditors to audit management's assessment of internal controls over financial reporting.

185.    As stated above, Defendants completed the required certifications stating that SAExploration established and maintained both disclosure controls and procedures as well as internal controls over financial reporting.

186.    Despite the wording in the certification, SAE's disclosure controls and procedures as well as its internal controls over financial reporting were not effective. Moreover, despite publicly acknowledging its responsibility to maintain adequate disclosure controls and procedures, as well as internal control over financial reporting and certifying that the controls were effective, SAE's controls were non-existent, rendering its financial statements false and misleading.

---

[23] SEC Final Rule "Certification of Disclosure in Companies' Quarterly and Annual Reports" effective August 29, 2002.

187.    Ultimately, SAE admitted that "material weaknesses exist in our internal control over financial reporting and that our disclosure controls and procedures were ineffective" in connection with the restatement of the Company's consolidated financial statements in the Form 10–K/A and this Form 10–Q/A (emphasis added). Further details regarding SAE's admission of its internal control failures are discussed in ¶¶ 199-204 below.

188.    Throughout the Class Period, SAE was forced to admit that, from time to time, it had identified material weaknesses in its internal controls over financial reporting. In light of these admissions in addition to: (1) the additional measures it allegedly undertook as a result of the material weaknesses to ensure that internal controls were effective; (2) the SOX certifications mandating a review and evaluation of internal controls to ensure their effectiveness; and (3) the various accounting schemes and manipulations, SAE and the Individual Defendants knew or were severely reckless in not knowing that every statement issued during the Class Period about the Company's internal controls and their effectiveness were false and misleading.

### 7.    False and Misleading Sarbanes-Oxley Certifications

189.    The Sarbanes-Oxley Act of 2002 ("SOX") requires a public company to evaluate and report on the effectiveness of its internal controls over financial reporting annually and that the principal officers certify their responsibilities for financial reports in each quarterly and annual filing. Sarbanes-Oxley Act of 2002, 107 P.L. 204, 116 Stat. 745, 777-778, 789, 806-807, 107 P.L. 204, 2002 Enacted H.R. 3763, 107 Enacted H.R. 3763 (§§ 404, 302, 906). SOX was enacted to "protect investors by improving the accuracy and reliability of corporate disclosures." Pursuant to SOX and the Exchange Act, a registrant's CEO and CFO are required to sign and certify, in each annual or quarterly report, that the report does not contain any untrue statement of a material fact necessary to make the statements made, in light of the circumstances under

which such statements were made, not misleading.  The officers must also sign and certify that they have evaluated the effectiveness of the issuer's internal controls as of a date within 90 days prior to the report, and have presented in the report their conclusions about the effectiveness of their internal controls based on their evaluation as of that date.  Finally, the officers must certify that they have disclosed to the issuer's auditors and the audit committee of the board of directors (or persons fulfilling the equivalent function), all significant deficiencies in the design or operation of internal controls which could adversely affect the issuer's ability to record, process, summarize, and report financial data, and have identified for the issuer's auditors any material weaknesses in internal controls, and any fraud that involves management or other employees who have a significant role in the issuer's internal controls.  *See* SOX, Section 302 (15 U.S.C. § 7241).

190.    Hastings, Beatty, and Whiteley completed certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud. Specifically, they each certified in substance that:

1.  I have reviewed this quarterly report on Form 10-Q of SAExploration Holdings, Inc.;[15]

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations

---

[15] The date and type of report (Form 10-Q or Form 10-K) reflected the period set forth in the relevant SEC filing to which the certification was appended.

and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control

over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

191. SAE, Beatty, and Whiteley also completed certifications pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (Sarbanes-Oxley Act of 2002, 107 P.L. 204, 116 Stat. 745, 806, 107 P.L. 204, 2002 Enacted H.R. 3763, 107 Enacted H.R. 3763), which certified in substantially similar language that:

> In connection with the quarterly report of SAExploration Holdings, Inc. (the "Company") on Form 10-Q for the period ended March 31, 2016, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Brian A. Beatty, President and Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to the best of my knowledge:
>
> 1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and
>
> 2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

192. SAE, Beatty, and Whiteley issued these certifications in connection with the Company's SEC filings on August 7, 2015 (Q2 2015 10-Q), November 5, 2015 (Q3 2015 10-Q),

March 15, 2016 (2015 10-K), April 4, 2016 (2015 10-K/A), and May 16, 2016 (Q1 2016 10-Q). SAE, Hastings and Whiteley issued these certifications in connection with the Company's SEC filings on August 12, 2016 (Q2 2016 10-Q), November 4, 2016 (Q3 2016 10-Q), March 17, 2017 (2016 10-K), May 5, 2017 (Q1 2017 10-Q), August 21, 2017 (Q2 2017 10-Q), November 8, 2017 (Q3 2017 10-Q), March 16, 2018 (2017 10-K), May 15, 2018 (Q1 2018 10-Q), August 9, 2018 (Q2 2018 10-Q), November 13, 2018 (Q3 2018 10-Q), March 25, 2019 (2018 10-K), May 14, 2019 (Q1 2019 10-Q).

193.     The statements identified above were materially false and misleading because Defendants' quarterly and annual reports consistently misrepresented and/or omitted, *inter alia*, the over $10 million of fraudulent transactions, misappropriation of funds, unlawful GAAP violations, and false representations detailed herein. As a result, and as described herein, each of the annual and quarterly reports did in fact contain untrue statements of material fact or omitted to state material facts necessary to make the statements made not misleading, and Defendants' annual and quarterly reports did not fairly present the financial condition, results of operations and cash flows of SAE.

194.     The misrepresentations and omissions described herein also mean that: (1) Defendants did not design effective disclosure controls or internal control over financial reporting; (2) Hastings, Beatty, and Whiteley engaged in fraudulent transactions and had undisclosed conflicts of interests, and could not have, and therefore did not, evaluate the effectiveness of  SAE's disclosure controls and procedures; (3) Defendants did not disclose when such conflicts and fraudulent transactions materially affected, or were reasonably likely to materially affect,  SAE's internal control over financial reporting; (4) Defendants did not ensure that material information relating to SAE, including its consolidated subsidiaries, was made

known to Defendants, or, in the alternative, recklessly disregarded such material information; (5) Defendants did not design internal control over financial reporting that could provide reasonable assurance regarding the reliability of the Company's financial reporting and the preparation of financial statements in accordance with GAAP; and (6) Defendants did not evaluate, or recklessly disregarded, the effectiveness of the SAE's disclosure controls and procedures.

### ECONOMIC LOSS AND LOSS CAUSATION

195.   During the Class Period, as detailed herein, Defendants engaged in a course of conduct that artificially inflated the price of SAExploration securities and operated as a fraud or deceit on the Class Period purchasers of SAExploration  securities by making the materially false and misleading statements and omissions recited above.

196.   During the Class Period, Defendants concealed from Plaintiffs and other Class members that SAExploration 's internal controls were inadequate and ineffective, that its financial statements and disclosures were incomplete and misleading in material respects, and that its leadership were engaged in a course of unreported self-dealing and related-party transactions through which they misappropriated millions of dollars of corporate funds. This, in turn, artificially inflated the price of SAExploration securities and operated as a fraud or deceit on purchasers of SAExploration securities by materially misleading the investing public.

197.   When the truth regarding the risk of SAExploration 's false financial reporting and the embezzlement by its senior management were revealed, and the concealed risks materialized, the price of SAExploration securities declined precipitously as the prior artificial inflation was removed from the price of the shares. As a result of their purchases of SAExploration securities at artificially inflated prices during the Class Period, Plaintiff and other members of the Class suffered a substantial economic loss (i.e., damages under the federal

securities laws). The price decline in SAE securities was a direct result of the nature and extent of the materially false and misleading statements and omissions revealed to investors and the market. Thus, the Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Plaintiff and the Class.

198.    The declines in SAExploration securities was caused by the revelation to the market about the true state of SAExploration's corporate governance and business operations, including its financial reporting, internal controls, and commitment to following foreign anti-corruption laws. These truths revealed that Defendants had concealed from the public that SAExploration was subject to a heightened risk of regulatory exposure. As investors fully understood the risk profile and true nature of SAExploration's business practices, the price of SAExploration's securities severely declined harming investors. This resulted in damages to SAExploration's U.S. shareholders.

### SCIENTER

199.    Each of the Defendants acted throughout the Class Period to make or permit statements that were false and/or materially misleading to the Plaintiffs and other SAExploration investors. While Defendants presented the public with statements suggesting that SAExploration was operating in strict compliance with GAAP, SAExploration had actually been engaged in falsifying its financial statements to report fictitious revenues and assets and conceal embezzlement and misappropriation by its senior management for years. Furthermore, Defendants misrepresented the compliance and commitment to ethics, when in reality, they knew about and failed to disclose SAExploration's culture of noncompliance and nondisclosure of conflicts of interest and self-dealing, and which they knew or were reckless in failing to recognize would expose SAE to heightened scrutiny by U.S. regulators and law enforcement

bodies, and could and likely would result in investigations and the potential for civil and criminal charges and penalties. Defendants made these statements with scienter given the fact that they knew, or consciously disregarded with extreme recklessness, the truth about Hastings and Whiteley's illegal conduct.

200.    Defendants Hastings and Whiteley knowingly and deliberately falsified SAExploration's financial statements in order to conceal their own diversion and embezzlement of corporate funds for their own use. Defendant Beatty knew, or at the very least was reckless in failing to discover, that Hastings and Whiteley were defrauding SAExploration's investors and the public. SAExploration's subsequent dismissal of all three Individual Defendants operates as an acknowledgement by the Company of their misconduct. SAE was forced in its restated 10-K and 10-Q filings to disclose the existence and nature of the fraudulent conduct, and they characterized the money Hastings and Whiteley had misdirected as "loss due to misappropriation of funds," effectively conceding that Hastings and Whiteley acted with scienter. As officers of SAExploration, Whiteley and Hastings made these misstatements while acting as agents of the Company, and their scienter must be imputed to SAExploration as a result.

201.    In conjunction with SAExploration's public financial statements filed with the SEC during the Class Period, Defendants Hastings and Whiteley issued certifications pursuant to § 302 of SOX, attesting that they reviewed the contents of the filings to confirm that the "report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading," and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of [SAExploration] as of, and for, the periods presented in this report."

202.    To assure each certification was not simply a hollow gesture, Defendants Hastings and Whiteley were required to and did further confirm that they were responsible for "design[ing] such disclosure controls and procedures, or caus[ing] such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to [SAExploration] . . . is made known to us . . . ." Hastings and Whiteley acknowledged that they had designed such controls to assure "to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."  Hastings and Whiteley further certified that they had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting," as well as "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

203.    Despite Defendants Hastings and Whiteley's SOX certifications, and their specific assurances concerning SAExploration's internal controls and remedial measures, which conveyed that all known accounting issues had been disclosed and were being remediated, Hastings and Whiteley knowingly concealed the existence of, *inter alia*, unresolved material weaknesses during the Class Period, which each of them actively exploited for their own personal gain.

204.    In addition to the foregoing, the Audit Committee Defendants were intimately involved with and controlled the Company's accounting and its financial reporting, and knew facts or had access to information suggesting that the Company's financial statements, and public statements, were false. For example, the Audit Committee members knew, or should have known, that the Company's internal controls were severely deficient or non-existent; that the

Company's Internal Audit reviews were incomplete and/or ineffective; and that the Company's accounting violated GAAP in numerous respects. If the Audit Committee Defendants had not been reckless, they would have detected the deficiencies in the Company's internal controls and the accounting improprieties that led to the material misstatement of the Company's financial statements, and should have acted to ensure that the Company's financial condition was accurately reported. Instead, during each quarterly and annual period relevant to this action, the Audit Committee recommended that the Board of Directors approve the Company's financial statements for inclusion in the Company's annual and quarterly reports.

## ADDITIONAL ALLEGATIONS OF THE INDIVIDUAL DEFENDANTS' SCIENTER

205.   Each of the Individual Defendants who sat on SAExploration's Board of Directors—Beatty, Sgro, Monahan, Cooper, Dalton, and Faust—knew or were fundamentally and flagrantly reckless in failing to discover the fraud being perpetrated by Hastings, Whiteley, and others within the Company. As detailed above, significant evidence existed from which the Board and Audit Committee had actual knowledge or should have known but recklessly disregarded that Hastings and Whiteley had established histories of fraud, self-dealing, and dishonest business practices. Had they exercised even basic oversight, they could have easily uncovered the paper trail Plaintiffs describe herein that connected ASV to SAExploration through Hastings and Whiteley, and through which Hastings and Whiteley were siphoning funds from the Company's coffers. As revealed herein by Plaintiffs' confidential informants— individuals who worked with and around Hastings and Whiteley for years—could and would have revealed evidence of their character to the Board had it performed even the most basic due diligence. Their failure to do so was flagrantly reckless, and in manifest dereliction of their responsibility as Directors to safeguard the interests of the Company and its investors.

206.    Defendant Beatty—the Company's Chairman of the Board and erstwhile founder and CEO for most of its history prior to Hastings' appointment in 2016—appears to have actively condoned and even participated in Hastings' and Whiteley's dealings with respect to ASV, and granted them cover by helping to conceal their illicit activities from investors and the public.

207.    Plaintiffs' investigation had revealed copious evidence that Hastings and Whiteley had engaged in fraudulent dealings for years, and they had acquired reputations as such among other the seismic data industry players in Alaska and Texas. As detailed in ¶¶ 56-60, above,_Plaintiffs were able to document a history of fraud and self-dealing by Defendant Hastings stretching back to the early 1990s.

208.    For the duration of the Class Period up to his dismissal in August 2019, Brent Whitely served simultaneously as the company's Chief Financial Officer, General Counsel, Director of Compliance, and Corporate Secretary. Confidential Informant #5, who was General Counsel of a Houston-based competitor of the Company from 2013 through 2016, and who had extensive dealings with Whiteley and with SAExploration, noted that it is unheard of for one person to hold all these roles, because it eliminates necessary checks and balances within the company. "The fact that the company would even do that is questionable," they said.

209.    Had the Board performed any significant oversight with respect to the adequacy of SAExploration's internal controls, they would have discovered this glaring vulnerability, among other material weaknesses. Had they inquired, they would very likely have identified the same suspicious paper trail and shell companies Whiteley set up to facilitate fraud and embezzlement by himself, Hastings, and others within SAExploration. They also might have rectified these material weaknesses by putting in place rudimentary internal controls which might

have identified and flagged glaring issues, e.g., that the Company had transferred $12 million under suspicious circumstances to a purported vendor that was headquartered in Whiteley's back yard.

210.    In addition, Confidential Informant #3, Confidential Informant #4, and Confidential Informant #5, all of whom were privy to negotiations in between SAExploration and a competing firm regarding a potential business combination during the Class Period, revealed that discussions were scuttled due to concerns the competing firm raised about SAExploration's dealings with ASV and its suspicious activities with respect to Alaska Exploration Credits. Both also reported that there were significant concerns about the honesty and trustworthiness of Hastings and Whiteley among the executives of the competing firm. Plaintiffs' counsel has independently verified several corroborating details provided by these Confidential Informants and believes their accounts to be credible. Confidential Informants noted no significant inquiry or oversight by Beatty or SAExploration's Board of Directors in connection with the above-contemplated negotiations.

211.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to SAExploration's business and operations, and to correct promptly any public statements issued by SAExploration which had become materially false or misleading.

212.    The Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which SAExploration disseminated in the marketplace during the Class Period. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about SAExploration's operations. Throughout the Class Period, the

Individual Defendants exercised their power and authority to cause SAExploration to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of SAExploration within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of SAExploration securities.

213.   By reason of their senior management positions and/or being directors of SAExploration, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, SAExploration to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of SAExploration and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

214.   By virtue of their positions at SAExploration, Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Individual Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each Individual Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

215.   The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual

Defendants were able to and did, directly or indirectly, control the content of the statements of SAExploration. As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to SAExploration's businesses, operations, and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of SAExploration securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning SAExploration's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired SAE securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

## FRAUD ON THE MARKET AND PRESUMPTION OF RELIANCE

216.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's securities are traded in efficient markets;

(d)    the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)    the Company traded on the NASDAQ, and was covered by multiple analysts;

(f)    the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Plaintiff and members

of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g)     Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

217.     At all relevant times, the market for SAE securities was an efficient market for the following reasons, among others:

(a)     As a regulated issuer, SAExploration filed periodic public reports with the SEC;

(b)     SAExploration securities met the requirements for listing, and were listed ad actively traded on the NASDAQ, a highly efficient market;

(c)     During the Class Period, SAExploration securities were actively traded, demonstrating a strong presumption of an efficient market;

(d)     SAExploration regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(e)     SAExploration was followed by several securities analysts employed by major brokerage firm(s) which wrote reports which were distributed to those brokerage firms' sales force and certain customers and which were publicly available and entered the public marketplace; and

(f)     Unexpected material news about SAExploration securities was rapidly reflected in and incorporated into SAExploration 's securities' prices during the Class Period.

218.    As a result of the foregoing, the market for SAExploration 's securities promptly digested current information regarding SAExploration from all publicly-available sources and reflected such information in SAExploration securities. Under these circumstances, all purchasers and acquirers of SAExploration securities during the Class Period suffered similar injury through their purchases or acquisitions of SAExploration securities at artificially inflated prices, and the presumption of reliance applies.

219.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## **NO SAFE HARBOR**

220.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this amended complaint.

221.    To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

222.    Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

223.    Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of SAExploration who knew that those statements were false when made.

224.    Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, even if they were identified as "forward-looking statements," which they were not, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of SAExploration  who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by the defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

225.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired SAExploration securities publicly traded on NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of SAExploration, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

226.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, SAExploration securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

227.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

228.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

229.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.   whether the Exchange Act was violated by Defendants' acts as alleged herein;

b.   whether statements made by Defendants to the investing public during the Class Period

misrepresented material facts about the business, operations and management of SAExploration;

c.  whether the Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d.  whether Defendants caused SAExploration to issue false and misleading SEC filings during the Class Period;

e.  whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

f.  whether the prices of SAExploration securities during the Class Period were artificially inflated because of defendants' conduct complained of herein; and

g.  whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

230.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

231.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a.  SAExploration shares met the requirements for listing, and were listed and actively traded NASDAQ, a highly efficient and automated market;

b.  As a public issuer, SAExploration filed periodic public reports with the SEC;

c.  SAExploration regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.  SAExploration was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

232.    Based upon the foregoing, the market for SAExploration securities promptly digested current information regarding SAExploration from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

233.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I
## Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
## Against All Defendants

234.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

235.    This Count is asserted against Defendants based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

236.    During the Class Period, Defendants, individually and in concert, directly or

indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

237.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

238.    employed devices, schemes and artifices to defraud;

239.    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

240.    engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of SAExploration securities during the Class Period.

241.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of SAExploration were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of SAExploration, their control over, and/or receipt and/or modification of SAExploration's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning SAExploration, participated in the fraudulent scheme alleged herein.

242.    Individual Defendants, who are the senior officers and/or directors of the

Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other SAExploration personnel to members of the investing public, including Plaintiff and the Class.

243.    As a result of the foregoing, the market price of SAExploration securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of SAExploration securities during the Class Period in purchasing SAExploration securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

244.    Had Plaintiff and the other members of the Class been aware that the market price of SAExploration securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased SAExploration securities at the artificially inflated prices that they did, or at all.

245.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

246.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of SAExploration securities during the Class Period.

## COUNT II
## Violations of Section 20(a) of the Exchange Act
## Against the Individual Defendants

247.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

248.     During the Class Period, the Individual Defendants participated in the operation and management of SAExploration, and conducted and participated, directly and indirectly, in the conduct of SAExploration's business affairs. Because of their senior positions, they knew the adverse non-public information about SAExploration's corporate governance and business prospects.

249.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to SAExploration's business practices, and to correct promptly any public statements issued by SAExploration which had become materially false or misleading.

250.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which SAExploration disseminated in the marketplace during the Class Period concerning the Company's corporate governance and business prospects. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause SAExploration to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of SAExploration within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of SAExploration securities.

251.     By reason of the above conduct, the Individual Defendants are liable pursuant to

Section 20(a) of the Exchange Act for the violations committed by SAExploration.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

A.    Declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Lead Counsel;

B.    Awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

C.    Awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: July 15, 2020                    Respectfully submitted,

**STECKLER GRESHAM COCHRAN PLLC**

/s/ R. Dean Gresham
R. Dean Gresham
Texas Bar No. 24027215
L. Kirstine Rogers
Texas Bar No. 24033009
12720 Hillcrest Road, Suite 1045
Dallas, Texas 75219
Telephone: (972) 387-4040
Facsimile: (972) 387-4041
Email: dean@sgc.law
Email: krogers@sgc.law

*Co-Liaison Counsel for Movants and [Proposed]
Co-Liaison Counsel for the Class*

**THE ROSEN LAW FIRM, P.A.**

Phillip Kim, Esq.
Laurence M. Rosen, Esq.
Brent J. LaPointe, Esq.
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com
Email: blapointe@rosenlegal.com

*Co-Lead Counsel for Movants and [Proposed] Co-
Lead Counsel for the Class*

**HILLIARD MARTINEZ GONZALES LLP**

Marion M. Reilly
John B. Martinez
719 South Shoreline, Suite 500
Corpus Christi, TX 78401
Telephone: (361) 882-1612
Facsimile: (361) 882-3015
marion@hmglawfirm.com
john@hmglawfirm.com

*Co-Liaison Counsel for Movants and [Proposed]
Co-Liaison Counsel for the Class*

**HAGENS BERMAN SOBOL SHAPIRO LLP**

Reed R. Kathrein
Danielle Smith
Lucas E. Gilmore
715 Hearst Avenue, Suite 202
Berkeley, CA  94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
danielles@hbsslaw.com
lucasg@hbsslaw.com

Steve W. Berman
1301 Second Avenue, Suite 2000
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

*Co-Lead Counsel for Movants and [Proposed] Co-Lead Counsel for the Class*

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which electronically delivered a copy of the same to all counsel of record.

*/s/ R. Dean Gresham*
R. Dean Gresham